**STATE**

v.

**Tajendra PATEL.**

**No. 2003–341–C.A.**

Supreme Court of Rhode Island.

June 20, 2008.

Jane McSoley, Esq., Providence, for Plaintiff.

Kevin Bristow, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

1. We recently affirmed Roger Graham's conviction for Sanjeev's murder in *State v. Gra-*

## OPINION

Justice FLAHERTY, for the Court.

In 1996, when the defendant Tajendra Patel (T.J.) married Komal Patel (Komal), the relationship between T.J. and Komal's family, who did not approve of the marriage, was very strained. Unfortunately, the marriage itself also became turbulent, and, in September 2001, Komal Patel took their four-year-old daughter, Kajal, and left the defendant.

For some time, Komal and Kajal lived at the Founder's Brook Motel in Portsmouth with Komal's sister, Prena Patel (Prena), her brother-in-law, Sanjeev Patel (Sanjeev), and their eight-year-old son, Jay. After Komal filed for divorce, Sanjeev acted as the primary contact between Kajal and T.J., accompanying his niece to the Swansea Mall for supervised visits with her father. Tragically, on January 1, 2002, Sanjeev Patel was murdered brutally by a man named Roger Graham (Roger or Graham), who had come to Rhode Island from Brooklyn, New York.[1] The only witness to this shocking event was Jay, who watched in horror as his father was shot to death in front of him in the office of the motel.

Graham had only one connection to the Patel family—defendant. In the second of two recorded statements to the police, defendant admitted that he knew Sanjeev's killer. In that statement, defendant told the police that he and a man named Roger were driving around on New Year's Day, and that he told Roger about the problems he had with Komal and her family. T.J. admitted that he drove Roger to the motel to show him where Komal lived. Once at the motel, T.J. claimed that he was

*ham,* 941 A.2d 848, 853 (R.I.2008).

stunned when Roger left the car and said that he intended to kill Sanjeev. The defendant told the officers that he waited in the car while Roger shot Sanjeev, and that the two of them then drove away.

The defendant was convicted by a jury of murder, in violation of G.L.1956 § 11–23–1, conspiracy to commit murder, in violation of G.L.1956 § 11–1–6, and discharging a firearm while committing a crime of violence, with death resulting, in violation of G.L.1956 § 11–47–3.2.[2] The defendant was sentenced to two consecutive life sentences for murder and discharging a firearm, and ten years, to be served consecutively, for conspiracy. He timely appealed to this Court.

On appeal, defendant argues that the trial justice erred when she (1) admitted an in-court identification of defendant because the identification procedure was unnecessarily suggestive and because the identification lacked independent reliability; (2) admitted a 9–1–1 call that was irrelevant and unfairly prejudicial; and (3) denied a motion to pass the case after two state witnesses characterized an envelope found in T.J.'s car as a "map" and "diagram" of the Founder's Brook Motel.

The state argues that the hearing justice erred when he concluded that the use of a showup procedure was unnecessarily suggestive; but, it contends that the trial justice was not clearly wrong in admitting either the in-court identification or the 9–1–1 tape.[3] Furthermore, the state argues that the trial justice was correct in her ruling that the inadvertent characteriza-

tion of the envelope did not warrant a mistrial. The state also filed a cross-appeal, in the event of a new trial, arguing that the trial justice's exclusion of certain statements of witnesses who came from New York with Roger Graham was in error. For the reasons stated in this opinion, we affirm the judgments of conviction.[4]

## I

### Facts and Procedural History

On January 1, 2002, young Jay was playing on the computer in the office of the Founder's Brook Motel, while his mother, father, aunt Komal, and cousin Kajal were in their attached apartment preparing for a candlelight dinner to celebrate the New Year. Jay testified that when the front door bell rang, signaling the arrival of a customer, his father, Sanjeev, went into the office to greet the customer, who was described by Jay as a thin black man with black hair, wearing a black jacket. The man asked about room rates, and after Sanjeev answered his questions, the man placed some money on the counter and left the office.

Jay testified that minutes later, the same man returned to the office, but this time he held a firearm and said, "[g]ive me all the money you got." Jay said that his father pleaded with the man, "[o]h, please, don't do that, sir. Please don't do that." However, the man shot Sanjeev multiple times before he left the premises. A terrified Jay ducked down and stayed close to

---

**2.** The defendant was acquitted of two charges, assault with intent to rob, in violation of G.L.1956 § 11–5–1, and conspiracy to commit robbery, in violation of G.L.1956 § 11–1–6.

**3.** The hearing justice, who presided over the pretrial hearings, was not the same justice who presided at trial.

**4.** Because we affirm the judgments of conviction, we do not address the state's arguments that the trial justice erred when she excluded the statements of the two men who accompanied Graham from New York.

the ground. He was the only witness to his father's appalling murder.

Sanjeev's wife, Prena, testified that before the air was punctuated by gunshots, she could hear her husband pleading with the customer, saying "[n]o, sir. No, sir. Please. No, sir." She entered the office after she heard the shots being fired and she saw a dark-skinned man, who was wearing a jacket with a hood, leave through the front door. Prena testified that at first she thought her husband was sitting down under the counter, but her son was telling her "[m]om, someone did shoot our dad." It was then that she saw that her husband was covered with blood.

Komal immediately called 9-1-1 for assistance. The tape of that emergency call was admitted into evidence at trial over defendant's objection. The defendant argued that the tape lacked significant probative value and also that it was unfairly prejudicial because it contained the "screams and anguished cries of Komal Patel." Furthermore, defendant argued that the tape of the 9-1-1 call was cumulative because Jay and Prena (as well as a police officer and firefighter) already had testified to the undisputed events that transpired. The state argued that the tape was relevant to show demeanor and that it was not unfairly prejudicial because it corroborated defendant's assertion that he was not the triggerman. The defendant also sought, in the alternative, the removal of the unintelligible portions of the tape, in which Komal's voice was muf-

fled by the sounds of screaming and crying.

The trial justice listened to the tape, listened to the arguments of counsel, and admitted the 9-1-1 recording in its entirety, stating only that, "[t]he Court feels that the admission of the tape does furnish relevant evidence to the jurors, and I will allow the State to play it," but notably, she did so without any discussion of either unfair prejudice or balancing the relevance of the tape against the potential for unfair prejudice. After the tape was played for the jury, the jurors also were provided with a transcript of the recording.

In the 9-1-1 call, Komal frantically explained to the operator that Sanjeev had been shot by a tall black man in a black jacket. As mentioned, the recording was difficult to understand—portions of Komal's speech were unintelligible and the tape contained a steady stream of screaming and crying in the background that interfered with the sound of Komal's anxious voice speaking to the operator. Significantly, these background sounds were not only the cries of Sanjeev's widow, but they also included the voice of a hysterical Jay, just after the boy had witnessed his father's death.[5] On the recording, Komal can be heard simultaneously responding to the operator, Jay, and her sister Prena, resulting in a cacophony of anguished voices. After the call was played for the jury, defense counsel noted the reaction of several of the jurors. "[I]n light of hearing the tape again, I would move to pass

---

**5.** Apart from the continuous noises that can be heard on the tape, the transcript records pages where Komal's speech is written as "indecipherable" or "unintelligible." The transcript also captured Komal's impossible position as she tried to comfort the surviving family, while providing information to the 9–1–1 operator. For example:

"DISPATCHER 2: Okay, ma'am, what's your name?

"VOICE: Komal. Would you be quiet, please, Prena. My name is Komal, k-o-m-a-l.

" * * *

"KOMAL: Okay. (Unintelligible) Don't worry ... Be quiet ... Hold on one second, my boy's crying. Hold on."

the case. I would note the reaction of several of the jurors, who appeared to be quite moved by this. \* \* \* I ask for a mistrial." The trial justice denied the motion.

During the investigation of Sanjeev's murder, the police investigation cast a wide net, and officers interviewed hundreds of people. One of those interviewed was Edward Melusky, an employee of Pizza Hollywood, a restaurant less than one mile from the motel. Melusky told the investigating officers that he remembered seeing two suspicious-looking men at the pizzeria on New Year's Day.

During the pretrial hearing, Melusky testified that the pair "looked like typical \* \* \* drug dealers \* \* \*," because the second, shorter man was wearing a lot of jewelry and they were driving a new and expensive car. Melusky testified that he remembered them because one of them made an unusual order of hot peppers on a single slice of pizza, requiring him to summon the manager. Melusky noted that he saw the pair again when he left to make a delivery, and he saw them again after he returned. He said that they were eating their food while sitting in a fancy foreign car. He noticed the car because it was a gold Acura with a Massachusetts license plate. At trial, he described the pair as an African–American man and a "Hispanic-looking" man, identifying defendant as the Hispanic man. Melusky explained that he "[was] not sure what nationality [the Hispanic-looking man was], but not white."

On January 26, 2002, the police interviewed T.J. for the first time. In his first statement, a recording of which was played for the jury, T.J. told the officers that he was not present in Rhode Island at the time of his brother-in-law's murder. He contended that he spent both New Year's Eve and New Year's Day with friends and family in Massachusetts. T.J. informed the police about his turbulent marriage and pending divorce and about how Sanjeev would supervise his visits with his daughter. T.J. described Sanjeev as a quiet man who did not drink and who kept to himself. T.J. also told the police that he harbored no ill feelings toward Sanjeev and that he appreciated his help with the supervised visits. Before defendant completed his interview and left the police station, the police took several photographs of his gold Acura.

On January 28, the police showed Melusky two pictures of defendant; one was an enlarged version of the other.[6] From these two photographs, Melusky identified defendant as the "Hispanic" man who was at the restaurant on New Year's Day.[7] During extensive pretrial hearings, defendant argued that Melusky's identification of defendant should have been excluded from evidence.[8] The hearing justice ruled that the police's use of the same two pictures of defendant was unnecessarily suggestive, especially in a situation in which there were no exigent circumstances. However, the hearing justice also concluded that Melusky's identification was inde-

---

**6.** At this time, the police also showed Melusky five pictures of defendant's gold-colored Acura.

**7.** At a later time, Melusky also identified Roger Graham, from a more traditional six-person photograph array, as the African–American man who visited Pizza Hollywood on the night of Sanjeev's murder.

**8.** On appeal, defendant argues that this identification was the basis of the warrant that led to the police's obtaining T.J.'s phone records; therefore, defendant argues that if this identification was impermissible then the evidence gleaned afterwards, the so-called fruit of the poisonous tree, including T.J.'s phone records and his statements after the cat was let out of the bag, also were impermissible.

pendently reliable and, therefore, he ruled that Melusky could make an in-court identification of defendant as the man he saw at Pizza Hollywood right before the murder took place.

Sheri Rogers and Dilip Bhatt, the front-desk clerk and general manager at the Days Inn, where T.J. and Komal previously had worked before she left him, also testified at trial. Rogers and Bhatt alleged that T.J., far from appreciating Sanjeev's assistance in facilitating visitation with his daughter, had expressed resentment against Sanjeev for interfering in his marriage with Komal. Rogers testified that a few weeks after Komal had left him, T.J. told her that Sanjeev and his wife were involved in Komal's leaving, and he was disappointed because they were supposed to be friends. Bhatt also testified that after Komal left him, T.J. was very angry and frustrated, and he complained to Bhatt that Sanjeev did not like him or the fact that he married Komal, and that Sanjeev interfered in his relationship with Komal.

After concluding that there were some major inconsistencies in defendant's statement, the police obtained a search warrant and retrieved T.J.'s cell-phone records in an effort to confirm whether he was in Rhode Island on that fateful day. The records revealed that defendant, indeed, was in Rhode Island during the time of the murder. On February 2, 2002, defendant acceded to law enforcement's requests and returned to speak with the police again; a

recording of this statement also was played for the jury. At first, defendant denied that he had been in Rhode Island during the time in question; however, once the police confronted him with his cell-phone records, he admitted that he knew the man who was responsible for killing Sanjeev.

The defendant claimed that on New Year's Day, he contacted a man named Roger, who lived in Brockton, Massachusetts, to secure some marijuana.[9] The defendant described Roger as a black man, about twenty-five or twenty-six years old, approximately five feet, nine inches in height, dressed all in black on that day. T.J. told the police that, initially, he and Roger smoked marijuana and then continued to drive around while consuming alcohol.

During the drive, T.J. confided in Roger about his marital problems and when Roger asked where his wife and his in-laws lived, T.J. offered to show him. Before reaching their destination, the pair became hungry and stopped at a pizza place for something to eat. T.J. told the police that after they finished eating, he drove Roger to the Founder's Brook Motel.

T.J. confided in the officers that once he stopped the car, Roger stepped out and declared his intention to kill T.J.'s brother-in-law. T.J. claimed that he tried to stop him. He said, "Come on back, man. You're gonna get me in trouble, you know. If something happen you're gonna get myself in trouble," but, despite his entreaties,

9. A subsequent police investigation uncovered the relationship between T.J. and Roger Graham, which began the previous October at Alba's Laundromat in Brooklyn, New York. Witnesses testified that the relationship between the two continued to flourish, and on December 31, 2001, Graham and his friend Monty France left Brooklyn in a car driven by a man referred to as "Tallest," to meet an acquaintance of Roger's in Boston. When

that car broke down at a North Attleboro gas station, the men removed the license plates from the car, and a passing police officer stopped them for suspicious behavior. The officer conducted a background check on the three men, which resulted in the arrest of France and "Tallest" on outstanding warrants. Graham was left to fend for himself at the gas station until defendant picked him up.

Roger ran toward the motel. T.J. told the police that he was about to drive away from the motel when he heard the sound of gunshots. Roger then reappeared carrying a silver firearm, jumped in the car, pointed the weapon at defendant, and ordered him to drive away. T.J. said that they began to quarrel and G Graham yelled back at him, forcing him to drive at gunpoint. T.J. said that he was so upset that he was shaking, and he began to drive north on Route 24. The defendant eventually dropped Graham at an exit in Rhode Island off Route 95 South, where Graham warned him that if he ever opened his mouth about what he had seen or heard, he would be killed.

After completing his statement, T.J. was charged with murder. He consented to a search of his vehicle, which revealed an envelope that had certain ink markings on it. The defendant also voluntarily took the police officers on a drive through Massachusetts and Rhode Island, showing them the route that he and Roger took on the day Sanjeev was killed. He showed the officers where he picked up Roger, the streets that they drove on together, where they ate at Pizza Hollywood, where he parked his car outside the Founder's Brook Motel office, and where he dropped off Roger after the murder.

At trial, Dennis Pincince, a state police officer in the Criminal Identification Unit, testified about "a map that was recovered" in defendant's car. The defendant objected to the portrayal and the trial justice

granted defendant's motion to bar any description of the markings on the envelope. The prosecution offered to characterize the envelope as a "diagram or a document," however, the trial justice ruled that no characterization of the envelope would be permitted. The trial justice then cautioned the jury to disregard the statement. She said, "[l]adies and gentlemen, you did hear mention of the word map. Just ignore the use of the term map. Okay? Thanks."

Later, during trial, Det. John Killian, the officer who searched defendant's car, testified that he found a "handwritten diagram" and a "diagram of the Founder's Brook Motel" in defendant's car.[10] Defense counsel immediately moved for a mistrial, arguing that this characterization transgressed the trial justice's earlier ruling, and the state police had been on notice that opinions as to what the drawing did or did not represent were not to be uttered. The attorney for the state explained, "[a]ll I asked him is what it was. I haven't gone over the questions with him—I went over the questions with him last night, and his answer was that it was a piece of paper with markings on it that was found in the car." She later said, "I did not instruct him that he could not refer to it when I went over the questions with him."

Although defendant argued that a cautionary instruction could not "unring the bell" and would serve only to reinforce the characterization to the jury, the trial jus-

---

**10.** Detective Killian's testimony on direct examination transpired as follows:

"Q What was inside the briefcases?

"A Again, personal papers, government records, banking records, handwritten diagram.

"MR. BRIODY: Objection.

"THE COURT: Overruled.

" * * *

"Q Detective, I'm going to show you what's been marked as State's Exhibit 61 and ask if you recognize that.

"(Said item handed to the witness)

"A Yes.

"Q Can you tell us what that is.

"A This is a diagram of the Founders Brook Motel that was recovered inside a briefcase that was taken out of—

"MR. BRIODY: Objection. Ask to be heard at the side, Your Honor."

tice decided to deny the motion for a mistrial and to give a cautionary instruction instead. She said:

> "Members of the jury, you have just heard this witness make reference to a so-called diagram. And also, you heard his testimony that this is a diagram of the Founders Brook Motel. The Court is striking that from the record.
>
> "I need your assurance you can totally ignore the fact that the witness so testified. It is not evidence in this case. It is not to be construed as any kind of evidence in this matter. Can I have your assurance that you will ignore that and, as hard as it is to unring a bell, pretend that you did not hear that?"

After the jury responded positively, the trial justice had the jury removed from the courtroom. The defendant again moved to pass the case. Instead, the trial justice advised Det. Killian not to "characterize what the writing is or the drawing is on that piece of paper" and to "only refer to it as a document * * *[.]"

After an extensive trial, the jury returned a guilty verdict on murder, conspiracy to murder, and use of a firearm while committing a crime of violence. The defendant challenges these convictions on appeal, arguing that the admission of Melusky's identification of defendant from his encounter at Pizza Hollywood was improper because the identification procedure the police used was unnecessarily suggestive and that the identification lacked independent reliability. T.J. also argues that playing the 9–1–1 recording for the jury was improper because it was irrelevant, and that any probative value it possessed was substantially outweighed by the danger of unfair prejudice. Finally, defendant argues that the trial justice erred when she denied a motion to declare a mistrial of the case after the state's witnesses characterized the envelope found in T.J.'s car as a "map" and a "handwritten diagram of the Founder's Brook Motel."

## II

## Analysis

### A.

### Motion to Suppress Melusky's Identification

■ On review, we will not overturn a trial justice's decision to deny a motion to suppress an identification unless it is clearly erroneous. *State v. Texter,* 923 A.2d 568, 573 (R.I.2007). "In determining whether or not the denial of a defendant's motion to suppress an identification was clearly erroneous, we assess the available evidence in the light most favorable to the state." *Id.*

■ We use a two-step procedure to determine whether the identification procedures the police employed violated a defendant's right to due process of law and the identification must be excluded. *State v. Camirand,* 572 A.2d 290, 293 (R.I.1990). First, "the [C]ourt must consider the question of whether the procedures used in the identification were unnecessarily suggestive." *Id.* If the procedure is found to have been unnecessarily suggestive, the second step requires a determination of whether the identification still has independent reliability despite the suggestive nature of the identification procedure. *Id.* (citing *State v. Nicoletti,* 471 A.2d 613, 615 (R.I.1984)).

■ A witness's out-of-court identification is not admissible at trial if the identification procedure employed by the police was "so unnecessarily suggestive and conducive to a substantial likelihood of misidentification that the accused was denied due process of law." *State v. Holland,* 430 A.2d 1263, 1269 (R.I.1981) (citing *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34

L.Ed.2d 401 (1972)). The United States Supreme Court has said that,

> "[i]t is the likelihood of misidentification which violates a defendant's right to due process * * *. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Biggers,* 409 U.S. at 198, 93 S.Ct. 375.

This Court never has adopted a *per se* rule of exclusion when police officers have employed a procedure in which they show a single photograph or a single individual to a witness for the purpose of identifying a suspect. *See State v. Hall,* 940 A.2d 645, 653 (R.I.2008) (citing *Texter,* 923 A.2d at 574). In fact, we have said that "admission of evidence of a show up without more does not violate due process," *id.* (quoting *Manson v. Brathwaite,* 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)), and we never have required the state to show evidence of exigency when such a procedure is used. *Texter,* 923 A.2d at 574 (citing *State v. Ramos,* 574 A.2d 1213, 1215 (R.I.1990)).

■ It is our opinion that the hearing justice prematurely concluded that the identification procedure, in which the police showed Melusky two copies of the same photograph, one being a "blowup" of the other, was unnecessarily suggestive. The hearing justice concluded that this violated the first part of the test simply on the basis that a single individual's photograph was shown, but he did not consider whether the procedure resulted in a substantial likelihood of misidentification. We believe this was error.

■ Although we agree that the better procedure is the use of a photograph array, we cannot, from this record, conclude that the procedure used here unnecessarily exacerbated the risk of misidentification. We are troubled by the fact that Melusky was shown a single photograph of an individual, who technically did not fit the original description of "Hispanic," as provided by Melusky. However, this, without more, is not enough to suggest that the risk of misidentification was substantial and this should have ended the inquiry. At this point, both the out-of-court and in-court identifications were admissible without further analysis. *See State v. Lynch,* 770 A.2d 840, 844 (R.I.2001).

■ In any event, the hearing justice then engaged in the second part of the test and permitted Melusky's in-court identification of defendant, concluding that it was independently reliable. Assessing whether Melusky's identification of defendant was independently reliable requires consideration of the totality of the circumstances, and, in particular, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *State v. Parker,* 472 A.2d 1206, 1209 (R.I. 1984) (quoting *Biggers,* 409 U.S. at 199, 93 S.Ct. 375).

The hearing justice concluded that Melusky, whom he characterized as "keen and alert," had ample time and opportunity to view the suspects as they gave their order and later while they ate in the car. The hearing justice was impressed with the level of detail Melusky recited, from the type of pizza ordered to details of the suspects' conversation. He also concluded that Melusky paid a high degree of attention to the men because of the fancy car they were driving. The hearing justice noted that Melusky testified that he knew

right away that the person depicted in the photograph was the same man he saw on that day. Finally, the length of time between his observation of defendant on January 1 and the identification on January 28 was not so long as to render the identification unreliable.

The defendant argues that the hearing justice failed to consider the accuracy of Melusky's prior description, in particular because he believed that the suspect was Hispanic; however, T.J. is Indian. It is clear that *Biggers* requires that the presiding justice conduct a holistic analysis of the circumstances, which includes weighing the various above-mentioned factors.

Here, we believe the hearing justice did consider Melusky's prior description of defendant as Hispanic, and he weighed it in light of Melusky's surprising attention to detail. T.J. certainly is not Hispanic. However, Melusky testified at trial that he "[was] not sure what nationality [he was], but not white." Melusky also stated during a pretrial hearing that he thought the suspect was "sort of Hispanic, [but he did not] really know what nationality." It is persuasive to us that this description, even if lacking in its precision, was the best description this nineteen-year-old Portsmouth pizza delivery person could convey with regard to the ethnicity of the suspect. We cannot expect him to pinpoint the suspect's exact country of origin. Rather, any discrepancies about his identification, including what he meant when he used the word "Hispanic," was an appropriate topic that could have been explored on cross-examination.

It is apparent that the *Biggers* factors weighed heavily in the state's favor. Even though, in this case, we conclude that the record does not support a finding that the showup procedure was unnecessarily suggestive or conducive to a substantial likelihood of misidentification, it is our inescapable conclusion that the hearing justice was not clearly wrong when he admitted Melusky's in-court identification. Therefore, we affirm that Melusky's identification was independently reliable and properly admitted into evidence at defendant's trial.

## B.

### Motion to Suppress Komal's 9–1–1 Phone Call

 The defendant next contends that the admission of Komal's 9–1–1 call into evidence violated Rules 401 and 403 of the Rhode Island Rules of Evidence.[11] The defendant contends that the recording was irrelevant and that even if it did have some minimal probative value, the playing of the tape in unedited form to the jury resulted in unfair prejudice that substantially outweighed any evidentiary value the recording may have had.

 We have said that the discretion to exclude evidence under Rule 403 must be exercised sparingly. *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1193 (R.I.1994). It is only evidence that is

---

**11.** Rule 401 of the Rhode Island Rules of Evidence provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Rule 403 of the Rhode Island Rules of Evidence provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

marginally relevant and enormously prejudicial that must be excluded. *State v. Silvia,* 898 A.2d 707, 717 (R.I.2006) (quoting *Wells,* 635 A.2d at 1193). Because "[t]he ultimate determination of the effect of evidence lies in the discretion of the trial justice," we will not disturb such a determination on appeal absent an abuse of discretion. *State v. Oliveira,* 774 A.2d 893, 924 (R.I.2001) (quoting *State v. Aponte,* 649 A.2d 219, 223 (R.I.1994)).

Below, defendant urged for the tape's exclusion because of its likelihood to inflame the passions and sympathies of the jury, or alternatively, that the crying and screaming that made much of the recording incomprehensible should be edited. The state countered that the tape was relevant to show the demeanor of all those present at the crime scene and to explain why the responders acted as they did. The state also argued that "murder is not a pretty sight," and the judge was free to give a cautionary instruction advising the jurors that sympathy was not to play a part in their consideration of the evidence.[12]

Unquestionably, the content of the 9–1–1 tape is disturbing to the listener—it portrays the agonized screams of the decedent's family, moments after his slaying. Additionally, it is difficult to understand Komal's statements to the emergency operator, a fact that is compounded by more screaming in the background; presumably from the little boy who watched as his father was gunned down. We also note that a transcript of the 9–1–1 call was available and utilized by the jury. Although this evidence—like any first-hand glimpse of a bloody homicide—is difficult for a jury to digest and is potentially prejudicial, we are of the opinion that any danger of unfair prejudice did not overcome its probative value.

█ A Rule 403 analysis requires the trial justice to not only examine the evidence in the context of the case on trial, but to balance the evidence to determine whether its probative force "is substantially outweighed by the danger of unfair prejudice, * * *." We agree with the First Circuit Court of Appeals that this balancing must be left to the trial justice's discretion; "[o]nly rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a [trial] court's on-the-spot judgment concerning the * * * weighing of probative value and unfair effect." *United States v. Rodriguez–Estrada,* 877 F.2d 153, 155–56 (1st Cir.1989) (quoting *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1340 (1st Cir.1988)).

Unfortunately, after the trial justice examined the 9–1–1 tape *in camera,* and ruled that it was admissible, she failed properly to set forth her reasoning and the factors that weighed in favor of its admissibility. The trial justice merely concluded that the tape "does furnish relevant evidence"—a finding that is both disappointing and of little assistance to this Court. However, we are satisfied that the issue of the tape's relevance, as balanced against the risk of unfair prejudice, is apparent on

---

**12.** The trial justice instructed the jury, after the close of the evidence, but prior to closing arguments:

"Ladies and gentlemen, sympathy or any kind of emotion must never play any part whatsoever in your deliberations. You must remember that what you are doing is weighing evidence. You are weighing evidence. The evidence is either there, or it is not there. You must never consider what effect the outcome of your verdict might have on anyone. You are examining evidence and following your oath and following these instructions. All any person in any courtroom is entitled to is your fair, thorough, conscientious, and objective evaluation of the evidence."

the record before us. After careful review of the transcript in this case, we are satisfied that the tape was relevant and probative to the crimes charged in the indictment and that the trial justice did not err when she allowed it to be played to the jury.

The state's evidence in this case largely was circumstantial. Under our law, we do not distinguish between the probative value of circumstantial and direct evidence; the jury must weigh the evidence and determine whether it establishes the guilt of the accused beyond a reasonable doubt. *State v. Caruolo*, 524 A.2d 575, 584 (R.I.1987) (citing *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954)). "The state may prove guilt by a process of logical deduction, by reasoning from an established circumstantial fact through a series of inferences to an ultimate conclusion of guilt." *State v. Diaz*, 654 A.2d 1195, 1202 (R.I.1995). We previously have held, in a context similar to the case before us, that the state "carries the burden of establishing every element necessary to the charge beyond a reasonable doubt, even if some of those elements may not be disputed." *State v. Mora*, 618 A.2d 1275, 1280 (R.I. 1993). Even when the evidence is gruesome, or graphic, or as in this case, produced in real time, the state has a right to establish the existence of the elements of the crimes. *See id.*

Although we concur with defendant that the evidence may have been cumulative, because eyewitness testimony was offered by the same witnesses as were on the recording, this fact does not overcome the tape's probative value. Notably, Komal placed Graham at the scene when she described the shooter as "a black guy," and "a tall guy." The state argues that the tape reflects the events immediately after the homicide and placed the co-conspirator at the scene, with a gun in his hand. Because defendant was charged with murder and conspiracy to commit murder, proof that Graham killed Sangeev was necessary despite the tape's disturbing content.

Notably, in *Mora*, 618 A.2d at 1280, this Court declined to hold that an enhanced audio-tape recording of the victim's screams during a brutal rape should have been excluded under Rule 403, even though the issue of force and coercion was not a disputed issue in the case. We also rejected the contention that the tape "was a needless presentation of cumulative evidence" or that it was intended "to evoke the jury's sympathies for the victim." *Mora*, 618 A.2d at 1280. The Court concluded that the recording established where the parties were situated and "served the same purpose as any other form of demonstrative evidence[.]" *Id.*

In the case before us, although we do not minimize the emotional wallop to anyone who listens to this recording, after balancing both ends of this difficult analysis, we cannot say that the danger of unfair prejudice substantially outweighed the probative value of the recording. Because we find no clear error, we affirm the trial justice's denial of defendant's motion to suppress the recording.

### C.

### Motion for a Mistrial

The defendant's last argument is that the trial justice erred when she denied defendant's motion for a mistrial after the state's witnesses repeatedly characterized an envelope found in the trunk of T.J.'s car as a "map" and "diagram" of the Founder's Brook Motel.

The trial justice has discretion to grant a mistrial and we will not disturb her ruling absent clear error. *State v.*

*Higham,* 865 A.2d 1040, 1044–45 (R.I.2004) (citing *State v. Lynch,* 854 A.2d 1022, 1033 (R.I.2004)). We will defer to the sound discretion of the trial justice and "[t]he reason we vouchsafe such broad power in the trial justice in this regard is 'that he or she possesses a "front-row seat" at the trial and can best determine the effect of the improvident remarks upon the jury.'" *State v. Mendoza,* 889 A.2d 153, 158 (R.I. 2005) (quoting *Oliveira,* 774 A.2d at 912).

At trial, Dennis Pincince, a witness for the state, first referred to the envelope as a map. Upon defendant's objection, the trial justice immediately struck his characterization of the envelope from the record, and the jury acknowledged that it would ignore that reference. The defendant did not ask for a mistrial at that time, although defense counsel did move to prohibit any future characterization of the envelope, including calling it a diagram. The trial justice granted the motion.

Despite the trial justice's ruling, Det. Killian, another witness for the state, later testified that he had found a "diagram of the Founders Brook Motel" in defendant's car. Following defense counsel's immediate and appropriate objection, and after denying his motion for a mistrial, the trial justice again gave a cautionary instruction to the jury, admonishing the jury not to consider his characterization as evidence. Although it is unclear from the record whether all exhibits with respect to the envelope were excluded (the original envelope was destroyed during processing), the trial justice did prohibit the state from referring to the envelope in its closing argument, and it appears that she prohib-ited the admission of an enlarged version of the envelope into evidence.

In our opinion, the trial justice did not commit clear error when she denied the motion for a mistrial, instead opting for a cautionary instruction to the jury. Any prejudicial effect caused by the comment sufficiently was minimized and, as we often have said, we will presume that the jury is able to follow such instructions in the absence of any evidence to the contrary. *State v. LaRoche,* 683 A.2d 989, 1000 (R.I. 1996). Here, there is no evidence that the jurors were unable to follow instructions. In addition to issuing the instruction, the trial justice also prevented the state from referring to the evidence in closing and she prevented the state from offering a blow-up of the document into evidence.

In our view, this was more than sufficient to overcome any potential prejudice which could have been suffered from the characterizations by the police witnesses, and although we are perturbed that the state's witness testified counter to the trial justice's earlier ruling, we do not see any clear error in her decision not to terminate the trial by mistrial.

### III

### Conclusion

We affirm the judgments of conviction and return the record to the Superior Court.