March 17, 2026

**Supreme Court**

No. 2024-207-C.A.
(P1/21-1222AG)

State                          :

    v.                         :

Justin Chandler.               :


NOTICE:   This opinion is subject to formal revision
before publication in the Rhode Island Reporter.  Readers
are requested to notify the Opinion Analyst, Supreme
Court of Rhode Island, 250 Benefit Street, Providence,
Rhode Island 02903, at Telephone (401) 222-3258 or
Email opinionanalyst@courts.ri.gov, of any typographical
or other formal errors in order that corrections may be
made before the opinion is published.

State                          :

v.                             :

Justin Chandler.               :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.** This case came before the Supreme Court on appeal by the defendant, Justin Chandler (Chandler), from a judgment of conviction in the Superior Court following a trial at which the jury found him guilty of three counts of conspiracy, murder in the first degree, felony assault, two counts of discharge of a firearm when committing a crime of violence, and two other firearms offenses.

On appeal, Chandler argues that the trial justice abused her discretion in erroneously admitting text messages from his girlfriend, Dilia Tavares (Tavares), in violation of Rules 802 and 403 of the Rhode Island Rules of Evidence. For the reasons set forth herein, we vacate the judgment of conviction and remand the case for a new trial.

**Facts and Travel**

On the morning of December 4, 2020, Nazaski Carrasco-Smith (Carrasco-Smith) and Devin Delacruz (Delacruz) sat in their vehicle at the corner of Putnam and Kossuth Streets in Providence, waiting to pick up Carrasco-Smith's four-year-old son from the bus stop. It was Carrasco-Smith's first time going to this particular bus stop. Suddenly, as the pair sat in the car scrolling on their phones, gunshots rang out. Carrasco-Smith was shot in the side and stomach. Delacruz was struck in the chest and back. Carrasco-Smith fell out of the vehicle and screamed for help. He did not see the shooter.

Multiple bystanders attempted to help, both by rendering aid to Carrasco-Smith and contacting 911. Soon after, several officers of the Providence Police Department (PPD) responded to the scene. Officer Jason Andrade first spoke with Carrasco-Smith, who appeared to be in shock. He then observed the other victim, Delacruz, who was unresponsive.

Officers searched the scene and surrounding area for evidence, ultimately locating several spent shell casings on the sidewalk near the passenger side of the vehicle. Detective Ralph Constantino (Det. Constantino) collected six casings and sent them to the State Crime Lab for analysis. He swabbed a portion of the vehicle for fingerprints but found none.

Carrasco-Smith's vehicle, a Toyota Venza, was towed to PPD headquarters, where it was processed. There, Det. Constantino discovered a small plastic container affixed to the bottom of the Venza. Inside the container, he found a GPS tracking device. Detective Constantino swabbed both the tracker and container for DNA. The GPS was later analyzed by Detective Theodore Michael (Det. Michael), who through the manufacturer identified the purchaser of the device as Yuleysi Garcia (Garcia). The tracker had been activated in late November, nine days before, and was active on the day of the shooting.

Detective Michael reviewed surveillance footage obtained from the scene and identified a suspect vehicle, a Nissan Altima, by tracing the vehicle's movements in the area. The footage included the moment the suspected shooter got into the Altima. Detective Michael discerned the license plate of the vehicle from the videos and traced it back to Richmond Rentals. Richmond Rentals confirmed the make and model of the vehicle, a 2015 Nissan Altima, and disclosed that the Altima was rented to a Danessa Perry.[1] Using GPS data from Richmond Rentals, Det. Michael located

---

[1] The trial transcript contains multiple spellings of Danessa; we defer to the spelling used most often and mean no disrespect. On direct examination, Det. Michael testified that Rachel Perry had rented the Altima. However, on cross-examination, Det. Michael stated that it was actually her daughter, Danessa Perry, who rented the vehicle. The investigation later connected Danessa Perry to Chandler's cousin, Jeffrey Chandler.

the Altima at the Courtyard Marriott in Lincoln, Rhode Island.[2]  Plain clothes

officers surveilled the Marriott and confirmed that the Altima was there.

Officers observed a female, later identified as Tavares, exit the Marriott, and

sit in the Altima for about ten minutes.  Tavares wore a Nike sweatshirt officers

believed matched the sweatshirt worn by the driver of the Altima during the

shooting.[3]  After Tavares exited the vehicle, officers detained her.  While officers

attempted to speak with her, Tavares's cell phone rang eight to ten times, all from

the same phone number, which had a 203 area code.  Marriott staff confirmed

Tavares's room number and informed officers that a male was staying in the room

as well.

Officers surrounded the hotel, then made a call to the 203 number, which

Chandler answered.  During the call, Det. Michael asked Chandler to come out of

the hotel room with his hands up.  Chandler complied, exiting the room within thirty

seconds.  Officers detained Chandler, then, with proper search warrants, seized the

Altima, Nike sweatshirt, and Chandler's cell phone.

Detective Michael obtained and executed search warrants for cell phone

records of Chandler, Tavares, and another individual, Jayson Rosario (Rosario).[4]

---

[2] Richmond Rentals utilizes a built-in GPS located in the engine blocks of their rental cars, which does not maintain live GPS tracking but rather transmits location data periodically throughout the day.

[3] The sweatshirt was a gray hoodie with zippers and a black stripe across the chest.

[4] Officers determined that Rosario was with Chandler after the shooting.

Using mapping software and Chandler's cell phone data, Det. Michael determined that Chandler's cell phone traveled from Pawtucket to Providence around 11:00 a.m. on December 4. Based on the data, Det. Michael determined that the phone was moving within the general area of Putnam and Kossuth Streets. Detective Michael obtained additional surveillance footage, which he sequenced together to further trace Chandler's movement. The videos depicted a black sedan traveling from Pawtucket to Providence around the Putnam Street area at the time of the murder.

In addition to the location data, Det. Michael also performed phone extractions on both Chandler's and Tavares's devices. Detective Michael recovered text messages in which Chandler told his aunt "[at] tis [*sic*] point I can't be outside [w]ithout a gun." Further, Det. Michael described a text message thread between Chandler and his friend Janoll Brown (Brown)[5] on November 3 and 4, 2020, in which the pair appeared to discuss the victim Delacruz's recent release from prison. Detective Michael confirmed that Delacruz was incarcerated during the fall of 2020 and was released in late October.

On the morning of December 4 at 11:25 a.m., Chandler received a text from Derek Valenzuela (Valenzuela)[6] which read: "[Let me know] when you turning on

[5] Janoll Brown was referred to as both Brown and Noll throughout trial. We refer to him as Brown for consistency and intend no disrespect.
[6] Valenzuela was referred to as Bundy or Valenzuela throughout the trial below. We refer to him as Valenzuela; no disrespect is intended.

- 5 -

my block." Phone records did not reveal any more text messages between the two until 5:56 p.m., which Det. Michael suggested could mean that Chandler had deleted some text messages. However, Det. Michael did not know with any certainty whether there had been additional deleted messages.

Detective Michael found a text message Chandler sent his mother on December 4, in which Chandler expressed his love and appreciation for her, as well as stating that he was lost and scared. Chandler's phone records also revealed several phone calls between himself and others on the morning of December 4, including Brown, Valenzuela, Tavares, and a snapchat account called "187 trapgang."[7] The phone logs showed more calls between the same parties throughout the afternoon of December 4. Based on the entirety of the extraction, Det. Michael characterized Chandler as a "heavy deleter" and noted that Chandler would often turn his location data off and on, including turning off his location data from about 10:30 a.m. until 12:00 p.m. on December 4.

Detective Michael performed a similar phone extraction on Tavares's phone, but in contrast, determined that she was not a "big deleter." From the extraction, Det. Michael recovered 150 pages of text messages between the couple. In the early morning hours of December 4, Chandler and Tavares texted about their lives and

---

[7] Detectives were unable to determine the identity of the user behind the 187 trapgang account. At trial, Det. Michael testified that he believed the number 187 to represent a Providence street gang, further discussed *infra*.

future together.  Tavares told Chandler that if he wanted to leave the state she would go with him, and that she wanted a better life for the two of them.  Chandler expressed that he had a lot on his mind and would be up all night.  Later that morning, Chandler and Tavares had another back-and-forth exchange during which Tavares asked him "what are [y]ou gonna go do" and stated that he was "giving [her] anxiety."  The two then discussed whether to meet up at a hotel later that day.

Later, at 11:44 a.m., Chandler sent Tavares a text that said, "[d]elete this." From that point on, Tavares and Chandler engaged in a heated back-and-forth exchange, during which Tavares repeatedly accused Chandler of involvement in Delacruz's murder.  Tavares made several statements, discussed in more detail *infra*, calling Chandler a liar and telling him his future was in jail.  Throughout the exchange, Chandler repeatedly denied any involvement and suggested someone else was responsible for the shooting.

On April 14, 2021, a grand jury charged Chandler with three counts of conspiracy, murder, two counts of discharging of a firearm while in the commission of a crime of violence, assault with a dangerous weapon, carrying a firearm without a license, and firing in a compact area.  A trial on the charges commenced on May 30, 2023, and continued until June 9, 2023.  Thirteen witnesses testified for the state.

At trial, Detective Matthew McGloin (Det. McGloin) testified as an expert in Providence street gangs.  Detective McGloin testified that there had been an ongoing

cycle of violence between several local gangs. In Det. McGloin's opinion, Chandler was a member of Clown Town, one of the gangs involved in the conflict. Detective McGloin testified that Delacruz was a member of Congress, otherwise known as the C-block gang, one of Clown Town's rivals. Further, Det. McGloin explained that Delacruz's brother had been indicted for the murder of a prominent Clown Town member, Devin Burney (Burney), and remained out on a warrant. Detective McGloin testified that Burney was a revered member of Clown Town and that he believed the tattoo on Chandler's hands, "Forever Devie," was a tribute to Burney. One of Chandler's music videos, entered at trial as a full exhibit, also paid tribute to Burney.

Detective Michael testified for the state as the lead investigative detective. Much of his testimony serves as the basis for the aforementioned facts. A significant portion of Det. Michael's testimony focused on the phone extractions, which he performed. During Det. Michael's testimony, the state presented the text messages between Tavares and Chandler. During trial, Chandler filed a motion *in limine* to exclude the text messages, which was argued outside the presence of the jury. The trial justice denied the motion and allowed Det. Michael to read the messages into the record. An unredacted printout of the text messages was entered as a full exhibit.

The jury returned a guilty verdict on all counts on June 9, 2023. Thereafter, Chandler filed a motion for a new trial, challenging the weight of the evidence. In a

bench decision, the trial justice denied the motion for a new trial.  The trial justice sentenced Chandler to two consecutive life sentences, for murder and discharging a firearm while committing a crime of violence, as well as several concurrent sentences for the other seven counts.  Chandler's premature notice of appeal followed.[8]  A judgment of conviction entered on February 26, 2024.

## Standard of Review

"In reviewing the admission or exclusion of evidence, it is well settled that the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of discretion is apparent." *State v. Baribault*, 247 A.3d 1237, 1249 (R.I. 2021) (quoting *State v. Cavanaugh*, 158 A.3d 268, 273 (R.I. 2017)).  "Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a trial court's on-the-spot judgment concerning the * * * weighing of probative value and unfair effect." *Id.* (brackets omitted) (quoting *State v. Patel*, 949 A.2d 401, 413 (R.I. 2008)).  "Accordingly, this Court will reverse a

---

[8] "A notice of appeal filed after the announcement of a decision, sentence, or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof." *State v. Li*, 297 A.3d 908, 916 n.9 (R.I. 2023) (quoting Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure).

trial justice's decision to exclude evidence where the exclusion amounted to an abuse of discretion." *State v. Aponte*, 317 A.3d 745, 750 (R.I. 2024).

## Discussion

On appeal, Chandler contends that the trial justice abused her discretion in admitting text messages from Tavares accusing him of involvement in the shooting. Chandler argues the text messages were impermissible hearsay statements used for the truth of the matter asserted in violation of Rule 802 of the Rhode Island Rules of Evidence. Alternatively, Chandler contends that the text messages were more prejudicial than probative under Rule 403 of the Rhode Island Rules of Evidence.

## Waiver

The state contends that Chandler failed to object to the admission of the text messages at trial and therefore did not properly preserve the issue for appeal. The state argues that Chandler objected only to some text messages, identified in the state's objection to Chandler's motion *in limine*, in which Tavares calls Chandler a liar. Particularly, the state contends that Chandler failed to object to Tavares's statements that Chandler's "future was in jail, and that older individuals had made him do it." Furthermore, the state contends that, because Chandler objected to

- 10 -

admission of the text messages based on Rule 404(b) and other grounds rather than hearsay grounds, his hearsay argument is waived.

In response, Chandler contends that he did properly preserve the issue for appeal, because the hearsay argument was addressed at the argument on the motion *in limine*. Chandler points out that much of the argument referenced hearsay, and that the trial justice was fully aware of the issues with Tavares's messages. Chandler argues that the objection to his motion *in limine*, which the state relies upon for its position that Chandler challenged only a subset of text messages, was never filed on the docket and is not part of the record on appeal.

"The raise-or-waive rule is a fundamental precept that is staunchly adhered to by this Court." *State v. Ricker*, 252 A.3d 721, 730 (R.I. 2021) (quoting *State v. Parrillo*, 228 A.3d 613, 623 (R.I. 2020)). "It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *Id.* (quoting *Parrillo*, 228 A.3d at 623). "The Rules of Evidence require that a specific ground for an objection must be stated unless the reason for the objection is clear from the context in which it was made." *State v. Barros*, 148 A.3d 168, 172 (R.I. 2016). "[I]n order to satisfy the strictures of our 'raise-or-waive' rule, an evidentiary objection must be sufficiently focused so as to call the trial justice's attention to the basis for said objection." *Id.* (deletion omitted) (quoting *State v. Diefenderfer*, 970 A.2d 12, 30 (R.I. 2009)).

- 11 -

Here, the record reflects that Chandler did properly object to the admission of Tavares's text messages. Chandler's motion *in limine* set forth several bases under the Rhode Island Rules of Evidence for the exclusion of the messages, first that the text messages were argumentative and irrelevant under Rule 402. Next, Chandler contended that the messages were improper lay opinion testimony under Rule 701. Third, Chandler's motion stated that the messages constituted impermissible character evidence. Lastly, Chandler stated that the admission of the text messages would violate Rules 702 and 608 as "human lie detector testimony."

During the argument on the motion *in limine*, Chandler asserted that the text message accusations were impermissible character evidence and more prejudicial than probative. Moreover, Chandler argued that Tavares would not be "subject to cross-examination" and that the "jury should [not] have an opportunity to hear or read those out-of-court statements * * *." Chandler stated that even if the texts were admissible as nonhearsay, the court must still consider Rule 403, and that the messages were unduly prejudicial.

The state argued that the messages were admissible to provide context to Chandler's own statements and that redacting the messages would change "the contours and the nature of the exchange between them." The state contended that the text exchange involved "mutual accusations" and that the jurors should understand "the exact context and meaning without changing what's in [the

messages]." In response, Chandler argued that a cautionary instruction would be ineffective because the messages are indicative of Tavares's knowledge of Chandler's gang affiliation and alleged involvement in the murder.

The trial justice explained that it was not within the province of the jury to agree or disagree with Tavares about Chandler being a liar and that a cautionary instruction would be appropriate given the probative value of the text messages. More specifically, the trial justice concluded that the text messages were of "perhaps some of the highest probative value that we can have" and that excising Tavares's statements would substantially alter the nature of the conversation. After the trial justice proposed her jury instruction, neither the state nor Chandler suggested any changes; however Chandler maintained his objection to the admission of the text messages. In conclusion, the trial justice stated that "having performed [the] balancing test on admissibility, the probative value outweighs any prejudice," and overruled Chandler's objection. Chandler renewed his objection at the close of the bench conference to ensure that the "record will be clean and clear on that." Chandler later renewed his objection when the state introduced the messages.

The objection to the specific text messages outlined in the state's objection to Chandler's motion *in limine* is preserved for our review. Additionally, although during the colloquy both parties agreed that the state had identified text messages in their objection to Chandler's motion, the ensuing discussion evidences an

all-encompassing objection to the admission of Tavares's statements as prejudicial. During the colloquy, both Chandler and the state focused on whether the messages were hearsay and, in turn, whether the messages' probative value was outweighed by prejudice. Furthermore, the trial justice was clearly aware of the concerns raised by defense counsel; indeed, she conducted a Rule 403 analysis, the result of which Chandler objected to twice. *See State v. Baptista*, 894 A.2d 911, 914 n.2 (R.I. 2006) ("The ground was apparent from the context of the defendant's objection, demonstrated by the motion *in limine*, coupled with the trial justice's immediate cautionary instruction."). Our review of the record reveals that the Rule 403 issue was adequately raised, considered, and objected to below, thus preserving the issue for our review.

## Relevance

Chandler contends that regardless of whether the messages were inadmissible hearsay, they were inadmissible because they were not relevant and far more prejudicial than probative. Chandler argues that Tavares's accusations and opinion on Chandler's veracity are irrelevant and that their inflammatory nature constituted prejudice that outweighed any probative value. In response, the state argues that the

- 14 -

messages would not have inflamed the passions of the jury and were highly probative given their temporal proximity to the murder.

Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." R.I. R. Evid. 401. Under Rule 402, all relevant evidence is admissible unless otherwise provided. R.I. R. Evid. 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *." R.I. R. Evid. 403. "Our precedent makes plain, however, that 'it is only evidence that is marginally relevant and enormously prejudicial that must be excluded.'" *Baribault*, 247 A.2d at 1249 (brackets omitted) (quoting *Patel*, 949 A.2d at 412-13). "[A] defendant seeking to overturn a trial justice's admission of evidence under a Rule 403 analysis has a high hurdle to clear." *Id.*

While Tavares's messages may have had some relevance, "[e]ven relevant evidence must be viewed through the prism of Rule 403." *State v. Hak*, 963 A.2d 921, 928 (R.I. 2009)). Many of Tavares's accusatory statements, particularly those calling Chandler a liar and telling him that his future was in jail, when balanced under the Rule 403 test, were unfairly prejudicial. A small selection of the messages admitted at trial include:

> "Your corny * * * You in a whole entire rental my n****
> * * * Mad f***ing dumb * * * You think them n****s

- 15 -

even f\*\*\* with you stupid \* \* \* Don't even come around me \* \* \* [I don't] even want no parts with a n\*\*\*\* who's future is in jail \* \* \* Bye

"You really dumb asf \* \* \* Go fw them n\*\*\*\*s PLEASE!\* \* \* Have them do everything you weirdo \* \* \* N\*\*\*\*s out here tryina make me get cribs and all that to go to jail and leave me stuck struggling \* \* \* For n\*\*\*\*s who don't do s\*\*\* for him \* \* \* F\*\*\* [Y]OU \* \* \* Honestly

"N\*\*\*\*s wanna go to jail for life so a bunch of P\*\*\*\* A\*\* N\*\*\*\*S can say bro was on court \* \* \* EVER WONDER WHY THEM OLDER N\*\*\*\*S MAKE YALL DO IT? \* \* \* F\*\*\*ing du[m]b\*\*\*[.]"

Contrary to the trial justice's conclusion, Tavares's messages do not pass the Rule 403 balancing test. Images of Tavares struggling alone while Chandler spends the rest of his life incarcerated cannot fairly be characterized to make any fact of consequence more or less probable. Tavares's repeated references to Chandler's fate in prison were undoubtedly prejudicial and had no place before the jury. *See State v. Brash*, 512 A.2d 1375, 1383 (R.I. 1986) ("The attention paid to this evidence \* \* \* convince[s] us that the probative value of this evidence, whose relevance and materiality rested on shaky ground, was clearly outweighed by its prejudicial effect."). These statements were of little relevance and served no proper purpose. Although the trial justice considered the requisite Rule 403 factors, we conclude that the admission of these often incendiary messages was unduly prejudicial to Chandler and constitutes error.

## Cautionary Instructions

The state contends that trial justice's cautionary instructions cured any resulting prejudice stemming from Tavares's text messages. In the state's view, the cautionary instructions properly guarded against any concern that the jurors might improperly consider the messages. In response, Chandler argues that the cautionary instructions were ineffective to cure the erroneous admission of Tavares's messages. Chandler argues that the cautionary instructions reinforced the jurors' consideration of the text messages and, in effect, directed the jury to consider the substance of Tavares's prejudicial messages.

This Court has held that "there is 'no precise formula to determine whether any prejudicial taint may have been cured by a cautionary instruction.'" *State v. Leonard*, 296 A.3d 111, 119 (R.I. 2023) (quoting *State v. Alexis*, 185 A.3d 526, 533 (R.I. 2018)). "Where the trial justice decides to utilize a cautionary instruction, the question before us is whether the trial justice's instruction can be fairly said to have removed from the jurors' minds, when weighing the evidence properly before them, the taint represented." *Id.* (quoting *Alexis*, 185 A.3d at 533).

When Det. Michael began to read Tavares's text messages into the record, the trial justice gave the following instruction:

> "Ladies and gentlemen, as you have been instructed earlier in the preliminary instructions, you are the judges of a witness'[s] credibility. It is up to you and you alone what to make of any statement between the defendant and Miss

- 17 -

Tavares in any text messages. What another person may say about the credibility of the defendant is of no moment. In other words, the statements made in a text exchange between the defendant and Miss Tavares are being offered to you for your consideration of what they were talking about in the hours after the murder. Whether Miss Tavares believed the defendant on this matter or on any other matter is not relevant to your consideration of the content of their discourse."

Before closing arguments, the trial justice reiterated her admonitions, stating:

"I will also remind you at this time that to the extent that any other person has commented upon the credibility of the defendant, that commentary should have no influence over your assessment of the credibility of the witnesses who have appeared before this court. That particular evidence was admitted for the purpose of putting into context what the defendant and Dilia Tavares were discussing in the hours after the murder. Whether Miss Tavares believed the defendant on this matter or any other matter is not relevant to your consideration of the content of those communications."

It is our opinion that, although thoughtfully crafted, the trial justice's cautionary instructions were ineffective to dull any prejudice caused by the inflammatory text messages.

Although Tavares's messages were admitted for the limited purpose of providing context to Chandler's messages, the initial cautionary instruction invited the jury to consider the entirety of the text exchange however they saw fit. While the later instruction did reference context, it only cautioned the jury not to weigh the messages against Chandler in terms of credibility. *See State v. Hie*, 93 A.3d 963, 972

(R.I. 2014) (holding that we will reverse "only if we are convinced that the cautionary instructions were untimely or ineffective * * *") (quoting *State v. Hoyle*, 122 R.I. 45, 48, 404 A.2d 69, 71 (1979)). It is our view that the instructions did not adequately guard against the unfair prejudice stemming from Tavares's messages that Chandler's future was in jail. Thus, we cannot conclusively say that the trial justice's cautionary instructions cured the prejudicial taint of the text messages.

### Harmless Error

The state contends that even if the messages should have been excluded, their admission was harmless because there was overwhelming evidence of Chandler's guilt. The state argues that considering the substantial evidence presented at trial including the state's thirteen witnesses, video placing the Altima at the scene, testimony regarding the gang rivalry, and text messages showing Chandler's inquiry about Delacruz weeks prior to the murder, Tavares's text messages were cumulative. Furthermore, the state reiterates that the trial justice's cautionary instruction negated any error.

In response, Chandler contends that the evidence of Chandler's guilt was not overwhelming, regardless of the number of witnesses presented, because the state's case was largely circumstantial. Moreover, Chandler contends that even the strongest evidence presented could not outweigh the harm of Tavares's statements,

which Chandler suggests were the "key link" in the state's case, as evidenced by the state's reliance on the text messages during its closing argument.

"In order to meet the harmless-error test, there must be proof beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Aponte*, 317 A.3d at 754-55 (quoting *State v. White*, 296 A.3d 692, 706 (R.I. 2023)). This Court must consider several factors in determining whether an error was harmless "including the relative degree of importance of the witness testimony to the prosecution's case, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case." *Id.* at 755 (quoting *State v. Mercurio*, 89 A.3d 813, 822-23 (R.I. 2014)). "The test to be applied is a retrospective one, administered at the close of all the evidence to determine whether the admission of certain evidence was harmless in light of all the evidence admitted on that point." *Id.* (brackets omitted) (quoting *White*, 296 A.3d at 706).

As Chandler points out, the state relied heavily on the text messages throughout trial, as demonstrated by the prosecutor's focus and characterization of the messages during closing argument. The prosecutor initially referred to the messages as "the entire critical exchange that we spent so much time on * * *." The

prosecutor then summarized the exchange again to the jury, underscoring its importance, particularly stating:

> "But it's where, just after the murder, [twenty-one] minutes, [twenty-one] minutes after the murder, 11:44, that Chandler tells her, [d]elete this. And that begins the rapid-fire exchange of texts, angry texts, arguing, bickering, however you characterize it based on your common sense, that occurred between Dilia Tavares and Justin Chandler beginning just [twenty-one] minutes after the murder. * * * But it's telling that Miss Tavares responds immediately to, [d]elete this, with [y]ou in a whole entire rental, my n****. Mad f***ing dumb. I don't even want no parts with a n**** whose future is in jail. Bye.
>
> "She isn't asking. She isn't asking why he's asking to delete the messaging. She already knows, and she's angry with him. Chandler isn't asking her what she means about the entire rental or being mad f***ing dumb, or him having a whole future in jail. He isn't asking any clarification. He doesn't need any. He knows exactly what she's accusing him of doing. And she knew right away, [twenty-one] minutes after the murder."

Furthermore, the prosecutor told the jury "[a]sk yourselves, when you look at [the messages] how would [Tavares] know [twenty-one] minutes after the events on Putnam Street that a rental was involved, that his rental was involved, unless she knew ahead of time, unless Dilia Tavares knew of Mr. Chandler's involvement before?" The prosecutor underscored Tavares's statements again for the jury, stating:

- 21 -

"Look what isn't mentioned in that Facebook post[9] that Dilia Tavares saw. She saw the post and she immediately thought of Justin Chandler and his rental. Look what isn't mentioned. There's no mention on that Facebook post of any suspect named, no victim is named. No gangs are identified, no vehicle or clothing is described in any detail. There's no physical description of any kind. Simply, [t]wo people were shot on Putnam Street, [b]e careful. Based only on that, a shooting and Putnam Street, Dilia Tavares knew Chandler was involved with the rental. Either she's clairvoyant or she knew about the conspiracy ahead of time. Those are the only possibilities based on the way that exchange occurs."

The prosecutor not only highlighted the importance of Tavares's messages, but repeatedly encouraged the jury to consider them in its analysis.

Considering the emphasis placed on the messages at trial, the state cannot prove beyond a reasonable doubt that the messages did not contribute to Chandler's conviction. *See Aponte*, 317 A.3d at 755 ("If the jury had not known of these potentially corroborative statements, we cannot say beyond a reasonable doubt that the defendant would have been convicted."). We are unable to say beyond a reasonable doubt that the jury would have convicted Chandler without Tavares's statements. Accordingly, we conclude that the erroneous admission of Tavares's statements was not harmless, and Chandler is entitled to a new trial.

---

[9] During Chandler and Tavares's text exchange, Tavares sent Chandler a screenshot of a Facebook post that described the shooting on Putnam Street.

## Hearsay

The primary basis of Chandler's appeal is that Tavares's text messages were barred by the hearsay rule and that the state improperly used them for their truth. Because we have determined that the messages were unfairly prejudicial, we need not address Chandler's hearsay argument.

## Conclusion

For the reasons set forth herein, we vacate the judgment of conviction and remand to the Superior Court for a new trial.

# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Justin Chandler. |
| **Case Number** | No. 2024-207-C.A. (P1/21-1222AG) |
| **Date Opinion Filed** | March 17, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Sean P. Malloy<br>Department of Attorney General<br>For Defendant:<br><br>Michael G. Ewart<br>Office of the Public Defender |