**STATE**

v.

**Akeem KING.**

No. 2007–178–C.A.

Supreme Court of Rhode Island.

June 10, 2010.

Jane M. McSoley, Department of Attorney General, for Plaintiff.

Mark B. LaRoche, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The defendant, Akeem King, appeals from his conviction by a jury in the Providence County Superior Court of second-degree murder. On appeal, the defendant contends that the trial justice erred in denying his motion to suppress a particular interview of his with the Providence police, which interview he contends was

conducted after an unnecessary delay in his presentment before the District Court. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts[1] and Travel

### A

### The Trial

This case arises out of the tragic and senseless death of a toddler, Marquel Davis. On the morning of August 1, 2005, the body of two-year-old Marquel was found lifeless in the third floor apartment of one Troy Figgs on Erastus Street in Providence. On October 28, 2005, a Providence County grand jury indicted both Mr. Figgs and defendant for the murder of Marquel, in violation of G.L.1956 §§ 11–23–1 and 11–23–2; they were also indicted for conspiracy to commit murder, in violation of G.L.1956 §§ 11–1–6, 11–23–1, and 11–23–2.[2] Prior to trial, the case against Mr. Figgs was severed from the indictment against defendant.[3] On September 28 and 29 and October 3, 2006, defendant was tried before a jury; at the conclusion of the trial, he was found guilty of second-degree murder.

Michelle, Marquel's mother, testified that, as of the time of her child's death, she had known both Mr. Figgs and defendant for six weeks. Michelle testified that, shortly after meeting the two men, she began to work as a prostitute in Boston (traveling from Providence to do so). In speaking of her activities as a prostitute, Michelle referred to Mr. Figgs as her "pimp." She stated that she would give Mr. Figgs most of the money which she earned as a prostitute and that Mr. Figgs would in turn provide her with clothes and food; in addition, he permitted her to stay at his Erastus Street apartment. She testified that, while she was working as a prostitute, she initially left Marquel in the care of two of her sisters, who also resided in Providence; she went on to state that, after approximately three to four weeks of leaving Marquel in the care of her sisters, she began instead to leave Marquel with defendant and Mr. Figgs. Michelle estimated that Mr. Figgs and defendant had watched Marquel seven or eight times prior to August 1, 2005 (the date when Marquel was found dead); she added that she had had no indication that her son was being mistreated while in their care.

On the night of Saturday, July 30, 2005, both Michelle and Marquel stayed at the Erastus Street apartment of Mr. Figgs, where defendant also resided. The following day, Sunday, July 31, Michelle went to work as a prostitute in Boston, leaving Marquel in the care of defendant and Mr. Figgs. She testified that she returned to the apartment at approximately 11:00 p.m. and that she observed Marquel lying face down on the bed next to defendant. She further testified that, although she gave the child a kiss on the cheek, she did not try to awaken him. Michelle testified that, at that point in time, there did not appear to be anything wrong with Marquel. She stated that she then left the Erastus Street apartment and that later, at approx-

---

1. The facts set forth in this opinion have been adduced from the testimony of several of the witnesses who testified at defendant's trial.

2. Prior to trial, the charge of conspiracy against defendant was dismissed by the prosecution pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

3. Troy Figgs was also indicted on a charge of pandering, in violation of G.L.1956 § 11–34–1, in connection with his having allegedly encouraged the mother of the deceased child to prostitute herself. (That statute has since been repealed.)

imately 2:00 a.m., when she attempted to return to the apartment, she was unable to gain entry. She said that she therefore proceeded to her sisters' home instead. Michelle testified that, at approximately 9:00 a.m. on the morning of August 1, she went to Mr. Figgs's apartment in order to pick up Marquel; at that point, she was informed by the police at the scene that her son had died. She further testified that, two weeks prior to his death, Marquel had been to see a doctor for a checkup and was found to be healthy.

Tanishia, a neighbor of Mr. Figgs who lived downstairs in the building, testified that, on the morning of August 1, 2005, she answered her door at the behest of defendant and Mr. Figgs, both of whom she knew to be living in the third floor apartment. She testified that defendant told her that "the baby was choking;" she further testified that she knew that the baby to whom they were referring was "Michelle's son."

Tanishia testified that, when she went upstairs and found Marquel, she noticed that "he wasn't breathing, that he was cold;" she stated that she then dialed 911. Tanishia, while on the phone with the 911 dispatcher, attempted to give Marquel CPR, but he remained unresponsive; she described the child to the operator as having a "pallor" and as being "stiff" and "bluish-gray." She further observed that there was "black stuff around [Marquel's] mouth," which she thought was vomit. She further testified that, while she was on the phone with the 911 operator, Mr. Figgs and defendant were behind her, and she recalled saying to them: "He's gone" or "The baby's gone." Tanishia testified that, at some point after that, while she was still on the phone with the 911 operator, she looked up and realized that the two men were no longer there. She further testified that she did not see either

defendant or Mr. Figgs at any time thereafter.

An assistant state medical examiner testified that she performed the autopsy of Marquel Davis. She described the injuries that she found as being consistent with "blunt-force trauma" to the victim's body. She further indicated that "multiple contusions" were found on "the decedent's head, torso and extremities * * *[, and] further injuries were found within the cranial cavity." Specifically, the medical examiner testified that she found nine contusions on the child's head. Her examination also revealed a midline shift and swelling of the brain. The medical examiner testified that a number of the bruises found on Marquel went beyond the fat tissue into the skeletal muscle—which, she stated, is indicative of "greater force" having been applied to that area; she further stated that there had been "several points of impact."

The medical examiner testified that the symptoms associated with the injuries which she found in the child's brain "can vary * * * from [the person] being groggy, drowsy, losing consciousness, possibly having seizures or being very rapidly unresponsive." She further testified that the head injuries that she found "would be consistent within this case of Marquel Davis [being] tossed from one person to the next" and would "be consistent with the child being struck with an object and then propelled either backward or forward." She stated that she also found evidence of vomit, which she said resembled the child's stomach contents; she further stated that "subarachnoid hemorrhage and injury of the brain are known to produce, in addition to pain, also nausea and vomiting." The medical examiner testified that the subdural hemorrhage that she found was acute and that, therefore, the injuries had occurred at a point in time just "several hours prior to the time of

death." The medical examiner stated that, in her opinion, the death of Marquel Davis was caused by "acute subdural hemorrhage and brain injury due to blunt force trauma." She further found the manner of death to have been "homicide." She additionally testified that the toxicology reports did not indicate the presence of either alcohol or "street drugs" in the child.

Detective Robert Fitzpatrick of the Providence Police Department testified that, on August 1, 2005, he and several other detectives responded to the Erastus Street apartment, where the deceased child had been found. Detective Fitzpatrick testified that, during the course of the investigation, defendant and Mr. Figgs were identified as the last persons to have been with the child prior to his death; he added, however, that neither Mr. Figgs nor defendant was present at the scene when the police arrived.

Detective Fitzpatrick testified that, later on August 1 (at approximately 4:00 p.m.) after he had returned to the police station, he was informed that both defendant and Mr. Figgs had arrived at the station. He further testified that the two men had come voluntarily to the police station and had not been brought in by police officers. Detective Fitzpatrick testified that he, along with other detectives, proceeded to conduct six interviews with defendant—the first five of which were conducted on August 1, while the sixth was conducted on August 2. The detective testified that defendant was arrested at the end of the fifth interview (very late on August 1). Detective Fitzpatrick indicated that he had recorded the interviews using a digital audio recorder. In the course of Detective Fitzpatrick's testimony at trial, all six recorded interviews were played for the members of the jury, who were also provided with transcripts of the recorded interviews.

In the first two interviews, defendant described how he had been awakened on the morning of August 1 by Mr. Figgs, who told him that "the little man was stiffed." The defendant asserted that, on the previous night, he and Mr. Figgs had been in Boston and had returned to the Erastus Street apartment at approximately 3:30 that morning. He stated that, when they arrived back at the apartment, the child was asleep in his bed. The defendant further described how Marquel was often left at the apartment sleeping; he stated that often no one watched the child. The defendant denied seeing anyone hitting or "getting physical with" the child; he also stated that he did not observe any bruises on the child.

In the third interview, defendant admitted that the last time he had seen Michelle was at the Erastus Street apartment in Providence at 10:00 p.m. on the previous night (July 31), when she had left her child with Mr. Figgs. (By contrast, in his first two interviews, defendant had stated that he had been in Boston on that night.) The defendant described how on that weekend there was "something * * * not right" with the child. He further stated that "the night before[,] the baby was drinking" (which the context indicates was a reference to alcoholic beverages); he added that they did not pay any attention to the child because they thought he was drunk.[4] The defendant told the police that he thought the child had "died from drinking."

---

4. The defendant stated that Marquel's mother, Michelle, had told Mr. Figgs and him, when she returned to the Erastus Street apartment on the night of July 31, that she gave the child alcohol all the time and that the child was "all right." However, in her trial testimony Michelle explicitly denied ever giving Marquel alcohol or drugs, and she also denied ever having seen anyone else do so.

In the fourth interview, defendant further related how things had not been completely right with Marquel in the days before his death. The defendant stated that he had observed bruises on Marquel's thighs, arms, and back. The defendant then stated, for the first time, that both Mr. Figgs and Mr. Figgs's brother (whom defendant referred to as "Twinkie") were "whopping his [*i.e.*, Marquel's] ass all day * * * banging him up." The defendant described Mr. Figgs and Twinkie as having been "real rough with the kid." The defendant then revealed that he had seen Mr. Figgs and Twinkie "playing football with the little boy * * *." He said that "Twinkie would throw the little baby to Troy [Figgs] and Troy would then toss him." The defendant then admitted that he too joined in this "game." He described how "the game" was "going so fast" that it reached a point where he "couldn't catch [Marquel] so the only thing that [he] could do was * * * make sure that [Marquel] hit the bed right." The defendant described the manner in which Mr. Figgs and Twinkie were throwing the child as being "real rough." When asked by the detective whether he saw the child hit his head at all, defendant stated that he saw him get "whacked" and said that he thought that the child might have hit Troy's knee.

At the beginning of the fifth interview on August 1 (which the transcript indicates began at 10:54 p.m.), after having been read his *Miranda*[5] rights, defendant waived those rights and continued to speak with the detectives. The defendant began by stating that he had not contributed to the bruises which, he had been informed, had been found on Marquel's head; and he denied having banged the child's head on the floor. He admitted to having been verbally abusive to the child and having told the child to go to sleep, which he contended was a good thing because Marquel "was always getting his ass whopped anyway." The defendant further stated that, if Mr. Figgs had caused the death of the child, he had done so accidentally.

Later in the fifth interview, defendant stated that, if Marquel "banged his head on something, it wasn't hard because [he] wasn't using that much force with the child." The defendant admitted to pillow fighting with the child during the weekend; he stated that he and Mr. Figgs and Twinkie were all throwing pillows at Marquel. He stated that, on some occasions, they would hit Marquel too hard and he would fall over; he added, however, that there was "a lot of stuff" around Marquel when such a fall happened (implying that the "stuff" would have broken the child's fall). The defendant said that there had been times when they were throwing the pillows "too hard"—"because there [had] been times when [Marquel] banged his head against the wall but he was okay afterwards." Later in the same interview, defendant stated again that "we was all getting rough with him." He added that, at a certain point in time, the child looked "lazy eyed * * * like he was about to pass out;" defendant stated that he then gave the child "a swallow" of beer. The defendant stated that the child thereafter "started getting tensed up" while sleeping.

Still later in that fifth interview, defendant reiterated that he had seen Twinkie throwing the child like a football to Mr. Figgs; he said that that activity reached the point where the child "didn't wanna get up" and instead would lie down. The defendant also stated that at times Mr. Figgs would push Marquel's head "back down into the wall." In describing playing football with Marquel, defendant this time

---

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

admitted that, ten to fifteen seconds after playing football with the child, he noticed that the child was "lazy-eyed" and "exhausted." He stated that the child "went to sleep right then and there;" he added that, when they tried to wake Marquel up, he would not get up. The defendant also described how, in the middle of the night, he noticed that the child had thrown up, and he said that he turned the child's head away from the vomit. The defendant contended that, when Michelle returned to the apartment, Mr. Figgs told her that they had caused Marquel to become drunk. The defendant again stated that he would "throw the pillow at [Marquel] real hard" and that he would "flick him" to discipline him; he further stated that Marquel was "getting hit with [Troy Figgs's] pillow all day * * * [b]y all of [them]." [6] The defendant then retreated from his earlier statement regarding his own participation in "the game" of catch (wherein the child was tossed back and forth by the participants)—claiming instead that he was playing videogames while that other "game" took place. [7]

In the sixth interview, which took place at approximately 1:30 p.m. on August 2, defendant described how they would "play-fight" with Marquel and would "box around with him;" however, he stated that, on the day at issue (Sunday, July 31), they "didn't know how rough [they were] being with him." The defendant then stated that he "didn't even know it was * * * the play-fighting that, that might've killed him;" he again stated that he had thought that it was the consumption of beer that had killed the child.

During that sixth interview, defendant also stated that he was sorry, and he said that they had been "rough with the baby accidentally." The defendant then admitted once again that there had been a game of catch with Marquel being tossed back and forth by Troy Figgs and Twinkie and himself. He stated that, after "the game," they gave Marquel beer, after which the child was "stumbling"—which, according to defendant, they thought was funny since they believed that he was drunk. However, defendant then stated that he thought "the baby was stumbling because he got hit in the back of his head, and * * * Troy [Figgs] told him to get up so quick." The defendant stated that "the only thing that could've brong [sic] those bruises on his head[ ] was that game of catch."

The defendant again stated that they had been "so rough with him;" he added that "[w]e all played a part in it." However, he then claimed to be "just guilty by association." The defendant stated that he was "sorry for * * * playing a part in the catch game" and "for being rough with him with the pillow." He stated that he "never intended to kill the kid" and that no one had such an intention.

On October 3, 2006, the jury found Akeem King guilty of the second-degree murder of Marquel Davis. [8] On November 30, 2006, the trial justice sentenced defendant to sixty years imprisonment, with forty years to serve and twenty years suspended, with probation. [9]

6. The defendant stated to the detective that the "pillow with a bunch of feathers all over the place" (which we presume to mean that the pillow had broken open) was "Troy's pillow."

7. It will be recalled that defendant was arrested at the end of the fifth interview. The record indicates that the arrest occurred at approximately 11:20 p.m. on August 1.

8. The jury found defendant not guilty of the more serious charge of first-degree murder.

9. On March 5, 2007, Mr. Figgs pleaded guilty to the second-degree murder of Marquel Davis and to the charge of pandering. He

## B

### The Hearing on Defendant's Motion to Suppress

The defendant's contentions on appeal center around the admission at trial of the just-described sixth interview. On November 16, 2005, defendant filed a pretrial motion to suppress the statements that he had made to the Providence police. Although the motion originally sought suppression of the "statements and/or admissions" obtained by the Providence police "on or about August 1, 2005" (thereby including all six interviews at the police station), defense counsel ultimately limited his suppression motion to the sixth interview.[10]

At the hearing on the motion to suppress, defendant contended that the statements made during his sixth interview should be suppressed due to what he argued was a violation of Rule 5(a) of the Superior Court Rules of Criminal Procedure; it was his contention that the sixth interview was the result of an unnecessary delay in presentment and that therefore his statements in that interview should be suppressed.[11] At the suppression hearing, the hearing justice heard testimony about the interviews at the police station from Providence Police Detectives Robert Fitzpatrick and William Mattera[12] as well as from defendant.

Detective Fitzpatrick testified at the suppression hearing that, during the first five interviews, which were conducted on August 1, defendant was "eager and cooperative." The detective further described defendant as having been desirous of "discuss[ing] the situation with [them];" he said that defendant appeared to want to "make sure [that the detectives] got all the facts." The detective further described defendant as having been "agreeable" with respect to answering the detectives' questions throughout the interviews on that day. Detective Fitzpatrick also testified extensively as to how Detective McGann and he had apprised defendant of his *Miranda* rights at the beginning of the fifth interview; he added that, after defendant had been apprised of his rights, he continued to answer the detectives' questions. Detective Fitzpatrick further testified that, after the conclusion of the fifth interview, defendant was "taken into custody and placed in [the] cell block area."

It is undisputed that, at 1:29 p.m. on August 2 (the day following defendant's late-night arrest at the end of the fifth

received the same sentence as defendant with respect to the murder—as well as an additional five years on the pandering charge (see footnote 3, *supra*). Both sentences are to be served concurrently.

10. The defendant's trial counsel conceded that the first five interviews were properly conducted. Counsel further stated that he was not contending that any of those five statements was involuntary or was the result of "inducement by some promise."

11. The hearing justice also conducted an analysis with respect to the voluntariness of defendant's statements at the police station and with respect to his waiver of his *Miranda* rights; he ruled that the statements had been made voluntarily and that defendant had waived his *Miranda* rights. However, because no appellate argument has been made with respect to the hearing justice's rulings as to those issues, we shall confine our analysis and discussion to the testimony and arguments made at the suppression hearing concerning Rule 5(a) of the Superior Court Rules of Criminal Procedure.

12. Detective Timothy McGann also testified at the hearing on the motion to suppress. However, his testimony did not pertain to the sixth interview or to the presentment issue. He testified only with respect to the five interviews conducted on August 1 and with respect to defendant's having been apprised of his *Miranda* rights and his waiver of same.

interview), the detectives began to interview defendant for a sixth and final time before bringing him to the District Court for arraignment. Detective Fitzpatrick testified at the suppression hearing that, at the beginning of the sixth interview, he removed defendant from his cell block and informed him that he "wanted to clear up some more inconsistencies * * * [i]f [defendant] wished to talk to [the detectives] about it again." Detective Fitzpatrick stated that defendant did agree to speak with the detectives again. The detective further testified that defendant was then reminded of his *Miranda* rights, of which he had been apprised the night before. Detective Fitzpatrick stated that, at the time of the sixth interview, defendant "was still eager to speak to us," although the detective acknowledged that defendant's tone had changed. The detective described defendant as having "had a mission to tell us his side of the story at [that] point." Detective Fitzpatrick stated that defendant never sought to terminate the sixth interview and never asked for counsel. He stated that, after that interview was concluded (*i.e.*, at approximately 2:10 or 2:20 p.m.),[13] defendant was taken to the District Court.[14]

Detective Mattera testified at the suppression hearing that he was the officer responsible for this case and that he was present at the police station when defendant was brought to the cell block at approximately 1:00 a.m. on August 2. The detective stated that between 9:00 a.m. (when he came back to the police station) and approximately 1:30 p.m. (when the sixth interview was conducted) on August 2, he was "[p]utting together paper work, putting together statements, preparing for

the arraignment." He acknowledged that the Sixth Division District Court was less than five minutes away from the police station. Detective Mattera testified that it would take only approximately five minutes to physically fill out a complaint form. However, the detective further testified that he did not arrange for defendant's arraignment immediately upon his arrival at the station at 9:00 a.m. because, at that point in time, he needed to compile paper work and "facts needed to be collected." The detective stated that the investigating officers had "about five hours of taped statements [that they] needed to go through and get the facts straight before [they] did the complaint form." Detective Mattera explained that he knew the crime with which he was going to charge defendant, but that he needed to review defendant's statements from the five interviews on August 1; he described those statements as containing "a lot of inconsistencies." Detective Mattera further stated that, although it was not done at his direction, he had knowledge of and gave his approval to the sixth interview.

With respect to the circumstances surrounding the sixth interview, defendant testified that he was placed in a cell before midnight on August 1. He further testified that he remained in the cell and was not brought to District Court on the morning of August 2. He added that he was allowed out of the cell block in the early afternoon of August 2, when he met with Detective Fitzpatrick, who asked him additional questions—which questions defendant testified he answered.

Based on the just-summarized testimony, the hearing justice held that defen-

---

**13.** Detective Fitzpatrick testified at the suppression hearing that the sixth interview lasted for approximately "forty to fifty minutes."

**14.** According to the testimony of Detective Mattera, Mr. Figgs was also brought to the District Court at some point in time after 2:00 p.m. on August 2.

dant's presentment before the district court "was not unnecessarily delayed." The hearing justice stated that the presentment was "reasonably prompt." The hearing justice further commented that "prompt presentation does not mean immediate."

The hearing justice further stated that, not only did he find there to have been no unnecessary delay, but he also found that the statements which defendant made early in the afternoon of August 2 were made "voluntarily" and were "consistent with his earlier statements." The hearing justice stated that he "credit[ed] the officers' testimony that the defendant was still willing and eager to offer statements to the police." The hearing justice additionally credited Detective Fitzpatrick's statement that defendant was "on a mission to tell his side of the story, which by [that] time had become multi-faceted." The hearing justice therefore found, "by clear and convincing evidence" and based upon his appraisal of the "totality of the circumstances," that defendant's statements were given "freely and voluntarily * * * [and] without compulsion or overreaching" on the part of the officers. The hearing justice therefore denied defendant's motion to suppress the statements that he made in the sixth interview.[15]

On appeal, defendant contends that the trial court erred in denying the motion to suppress his statements to the Providence police detectives during the sixth interview. He contends that the delay in presentment before a judge of the District Court was unnecessary and was "causative" of the sixth interview—which he contends necessitates the suppression of the statements that he made during the sixth interview that took place during the period of delay.

## II

### Analysis

Rule 5(a) of the Superior Court Rules of Criminal Procedure reads in pertinent part as follows:

> "Unless otherwise provided by statute, an officer making an arrest under a warrant issued upon a complaint shall take the arrested person without unnecessary delay before a judge of the District Court as commanded in the warrant."[16]

Although defendant has alluded to various federal cases and a federal statute, we have stated, in characterizing our own Rule 5(a), that the rule is "not a constitutional command to be found within the text of our Federal or State Constitutions, and its breach does not necessarily create any constitutional violation." *State v. Nardolillo*, 698 A.2d 195, 199 (R.I.1997). Instead, this Court has viewed "the rule as a prophylactic measure designed to prevent other constitutional infirmities." *Id.* For this reason, we consider this Court's opinions interpreting our Rule 5(a) to be controlling, and we shall confine ourselves to a review of same.[17]

---

15. The hearing justice also explicitly found that defendant had been "apprised of his Miranda rights" and that he had understood those rights when he "thereafter freely and voluntarily decided to speak to the officers * * *."

16. We also note that the District Court Rules of Criminal Procedure provide a virtually identical Rule 5(a).

17. While cases interpreting and applying federal rules may at times be enlightening as we interpret and apply our rules of criminal procedure, those federal cases are by no means binding on us as we deal with a Rhode Island rule such as Rule 5(a). Accordingly, we consider defendant's reliance on such federal cases as *Corley v. United States*, — U.S. ——, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009), to be largely misplaced.

In interpreting Rule 5(a), this Court has held that delay in presentment, without more, does not warrant automatic suppression of a statement made during the period of delay. Rather, we have squarely held that "delay, if it is to render a confession inadmissible, *must have been operative in inducing the confession.*" *State v. Lionberg*, 533 A.2d 1172, 1178 (R.I.1987) (emphasis added); *see also Nardolillo*, 698 A.2d at 199. We have likewise stated that a "[hearing] justice must consider whether the time preceding a suspect's statement had any *causative effect* upon his [or her] * * * decision to confess." *Lionberg*, 533 A.2d at 1178 (emphasis added) (internal quotation marks omitted); *see also Nardolillo*, 698 A.2d at 199; *State v. Ferola*, 518 A.2d 1339, 1344 (R.I.1986) (stating that the Court must "consider whether the so-called delay in bringing the defendant before a judicial officer in any way *prompted* [the defendant] to give the police his inculpatory statement") (emphasis added) (internal quotation marks omitted); *State v. Cobb*, 494 A.2d 1182, 1185 (R.I.1985). Therefore, "the elapsed time between the defendant's arrest and his confession is the critical period we must examine and scrutinize in order to determine if it had been *operative in inducing* the defendant's admissions." *Nardolillo*, 698 A.2d at 199 (emphasis added); *see also State v. Brown*, 898 A.2d 69, 78 (R.I.2006); *State v. Johnson*, 119 R.I. 749, 756, 383 A.2d 1012, 1017 (1978).

We therefore reiterate that, pursuant to our well-settled case law with respect to Rule 5(a), a defendant who seeks to have his or her statement excluded must demonstrate *both:* (1) that the delay in presentment was unnecessary *and* (2) that

such delay was "causative" with respect to his or her confession.

Our careful review of the record in this case (including the testimony with respect to the circumstances surrounding the sixth interview and the transcript of that interview itself) has led us to conclude that there was *no causal nexus*[18] between the delay in presentment (whether necessary or unnecessary) and defendant's consent to participation in the sixth interview. In other words, the record is devoid of any indication that the delay in presentment on August 2 had any "causative effect" with respect to defendant's cooperation in the sixth interview. *See Lionberg*, 533 A.2d at 1178. Thus, without passing upon the hearing justice's ruling that the delay in presentment before the District Court was not "unnecessary," it is clear to us from the record that the delay in defendant's presentment before the District Court was not in any way "operative in inducing" defendant to make such further statements. *See Nardolillo*, 698 A.2d at 199. Rather, the record reveals that defendant was eager to talk with the detectives from the very first interview, and that eagerness continued throughout the sixth interview—which was further indicated by Detective Fitzpatrick's description of defendant during the sixth interview as having been on "a mission to tell * * * his side of the story."

It is clear and undisputed that, by the time defendant gave his sixth statement, he had already willingly agreed to participate in five other interviews with the detectives, in which interviews he made statements that were increasingly inculpatory. Like the hearing justice, we perceive in the record no evidence to suggest

---

**18.** It is important to distinguish between the *occasion* for an occurrence and the *cause* for an occurrence. The mere fact that an event (*e.g.,* an incriminating confession) occurs within a period of delay does not mean that the delay necessarily *caused* that confession to have taken place.

that the inculpatory statements made by defendant in the sixth interview were in any way made "because of or as a result of the delay in his being presented before a judge of the District Court." *See Nardolillo,* 698 A.2d at 199. We are further unconvinced that the inculpatory statements made by defendant in the sixth interview were "in any way prompted" by the delay in his presentment. *See Ferola,* 518 A.2d at 1344. Instead, the record is clear that, during that sixth interview, defendant was "still eager to speak to [the detectives]" and that he continued to willingly and voluntarily relate to the police his version of what had transpired during the hours leading up to the death of Marquel Davis.

We are further unable to view the circumstances of the sixth interview as demonstrating a "police tactic of delay designed to produce an involuntary or unwitting confession"—Rule 5(a) having been enacted in order to militate against the employment of such tactics. *See Nardolillo,* 698 A.2d at 200; *see also State v. Robinson,* 658 A.2d 518, 521 (R.I.1995). We instead view defendant's further inculpatory statements during the sixth interview as representing merely another attempt by defendant to persuade the police as to the veracity of his version of the events, while simultaneously attempting to shift blame away from himself. We are therefore convinced "that not one shred of evidence exists that the * * * delay in bringing the defendant before a judicial officer in any way prompted him to give the police his version of what occurred" in the Erastus Street apartment at the end of July 2005. *See Cobb,* 494 A.2d at 1185.

Therefore, without deciding whether or not the delay was "unnecessary," we agree with the trial justice that the delay in the presentment of the defendant was not "op-erative in inducing" him to make his sixth and final statement. *See Nardolillo,* 698 A.2d at 199.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be remanded to that tribunal.

Justice INDEGLIA took no part in the consideration or decision of this appeal.