March 31, 2021

**Supreme Court**

No. 2019-59-C.A.
(K1/16-69B)

State                          :

v.                             :

Richard Baribault.             :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or     Email  opinionanalyst@courts.ri.gov,  of  any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | | |
|---|---|---|
| State | : | |
| v. | : | |
| Richard Baribault. | : | |

Present:  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  The defendant, Richard Baribault, appeals from his conviction following a jury trial in Kent County Superior Court for second-degree murder, receiving stolen goods, conspiracy, operating a vehicle on a suspended license, and carrying a knife greater than three inches in length.  For those offenses, the defendant was sentenced to life imprisonment at the Adult Correctional Institutions for the murder, a consecutive ten-year sentence for the conspiracy, and suspended one-year sentences for each of the three remaining convictions, with probation.

On appeal, defendant argues that (1) the trial justice erred by failing to suppress the fruits of a police interrogation, urging that the interrogation violated Rule 5(a) of the Superior Court Rules of Criminal Procedure and the Fourth Amendment to the United States Constitution; (2) the trial justice abused his

discretion by declining to redact certain statements that defendant had made outside the presence of his interrogators that were overly prejudicial and that were shown to the jury; (3) defendant was denied medication during his extensive detention and interrogation in violation of his Fifth Amendment rights; and (4) the trial justice abused his discretion by failing to suppress a witness's out-of-court identification. For the reasons set forth herein, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

This case involves the brutal beating and murder of Fernando Silva, a seventy-year-old man who was found dead aboard his sailboat. Following an investigation by the Warwick police, defendant was arrested and, on January 27, 2016, a Kent County grand jury indicted defendant for the murder, in violation of G.L. 1956 § 11-23-1; defendant was also indicted for conspiracy to commit robbery, receiving stolen goods, driving with a suspended license, and possession of a knife greater than three inches in length, in violation of G.L. 1956 § 11-1-6; G.L. 1956 §§ 11-41-2 and 11-41-5; G.L. 1956 § 31-11-18; and G.L. 1956 § 11-47-42, respectively.

## A

### The Investigation and Arrest

On August 4, 2015, while he was on routine patrol, the City of Warwick's Chief Harbormaster, Jeffrey Baris, came upon a twenty-six-foot sailboat that was

"dragging the anchor" at the northern end of Warwick Cove. The older, yellow-hulled sailboat was named "*Star Capella*." Mr. Baris boarded the *Star Capella*. After taking notice of its disheveled state, and, believing that nobody was aboard, Mr. Baris towed the *Star Capella* and then secured it to a vacant mooring in the south end of the cove.

Eleven days later, on August 15, Mr. Baris attempted to make a visual check of the *Star Capella* to ensure that it remained properly moored. Mr. Baris became aware of a foul odor as he approached the vessel. By the time he boarded the boat, he found the odor to be overpowering. While aboard, Mr. Baris observed significant insect activity. Investigating, he used a bore, which he described as a pole with a hook at one end, to lift objects inside the cabin. After using the bore to displace a piece of plywood, a foam mattress, and a blanket, Mr. Baris discovered what he believed to be human feet, covered by flies and maggots and in an advanced stage of decomposition. Mr. Baris immediately contacted law enforcement.

The Warwick Police Department quickly determined that the body that had been found aboard the *Star Capella* was that of Fernando Silva, who was known in the community as "Captain Freddy." Captain Freddy owned and lived on the *Star Capella*. The police received a tip that the vessel previously had been docked at the Warwick Cove Marina but, after speaking with the owner of that marina,

investigators learned that the sailboat actually had been docked at a private dock that had been rented by Stephen Emerson, a local quahogger.

The police spoke with Mr. Emerson on August 18, 2015. Mr. Emerson, who lived at property abutting the dock, told police that he had observed two white men attempting to start the *Star Capella*'s engine. He also led the officers to Donald "Ducky" Waterman in an effort to assist in identifying the two men. The next day, while trying to locate Ducky, police instead encountered his brother, Charles "Chucky" Waterman. Chucky told police that, a couple of weeks prior, Troy Gunderway had tried to assist Captain Freddy in acquiring a new engine for his boat. Chucky led police to Ducky and, in turn, to Mr. Gunderway, who was living sometimes in a tent in Ducky's backyard and sometimes at the home of Ducky's father. Mr. Gunderway admitted to police that he had done work on the *Star Capella* and said that he had been assisted by defendant, who drove a red pickup truck.

The police determined where defendant lived after speaking with Mr. Gunderway. The same day, the police traveled to that location in search of a pickup truck that matched the description given by Mr. Gunderway. The police discovered a maroon pickup truck outside defendant's residence and "ran" the license plate affixed to the vehicle. After doing so, the officers learned that the license plate had been reported stolen. The police also conducted a "driving abstract" on defendant and learned that his driver's license had been suspended. After staking out that

location for several hours, the police observed defendant leaving the residence. At that time, they identified him through photographic records of the Department of Motor Vehicles.

The police arrested defendant after they observed him entering and operating the truck. The defendant was charged with three misdemeanors at that time: Possession of stolen license plates, driving on a suspended license, and possessing a knife greater than three inches in length, which was discovered on his person during the course of a search incident to his arrest.[1] After his arrest, and before he was arraigned the following afternoon, defendant was held in custody and was interrogated by the police on three separate occasions. While he was in police custody, defendant made a number of contradictory and incriminating statements, which ultimately led to his being charged with the murder of Captain Freddy.

**B**

**The Trial**

The defendant stood trial by jury in Kent County Superior Court, which commenced on June 14, 2017. The trial continued over a two-week period and resulted in voluminous testimony and evidence. The following is a summation of

---

[1] The knife was stained with a "reddish brown substance" that was later determined to be blood that came from the body of Captain Freddy.

the testimony and evidence produced during defendant's trial that is relevant to this appeal.

## 1

## Testimony of Stephen Emerson

Mr. Emerson testified that, on July 31, 2015, he discovered that the *Star Capella* was docked at the private dock at the end of his property, a dock of which Mr. Emerson claimed to be "in charge[.]" Mr. Emerson confronted Captain Freddy, who explained that he was docked in that spot with the permission of Mr. Emerson's landlord, through his friend, Donald Waterman. Mr. Emerson did not work the following morning. He testified, however, that, accustomed to his typical quahogging schedule, he was awake early in the morning, "about sun up[,]" when he noticed two individuals crossing through his yard carrying a cooler and gasoline container. Mr. Emerson identified one of those men as defendant.

Mr. Emerson further testified that he confronted the two individuals that morning about cutting through his yard. Both appeared nervous, he recounted, and one responded, "We are moving Freddy's boat up to Conimicut. He's getting high with a woman and he asked us to move the boat." Mr. Emerson said that he saw the individuals go to the boat, begin moving things around, and attempt to start the engine. After about an hour, he testified, Mr. Emerson went down to the boat and

offered his assistance to the individuals. Shortly thereafter, the two individuals left so that they could return with another engine.

Mr. Emerson recalled that one of the individuals, the one who was not defendant, was "in and out" of Mr. Emerson's backyard that day many times, returning to the boat in an effort to start the engine. Mr. Emerson testified that, at one point in the early afternoon, he observed defendant sitting in a red burgundy truck, parked on the side of his house, at the same time the other individual worked on the boat. Eventually, Mr. Emerson recounted, the individual who was not defendant began moving the boat but, after experiencing engine trouble, the boat "turned around and it was bouncing off other boats[.]"

Mr. Emerson testified that, at some point, he went to Boston with his girlfriend. When he returned on August 4, 2015, he noticed that the vessel was no longer at the dock.

**2**

**Testimony of Donald "Ducky" Waterman[2]**

Ducky Waterman, a commercial shell-fisherman, testified that he first met Captain Freddy in the summer of 2015. At that time, Captain Freddy had asked Ducky for a ride because his bicycle had been stolen. The witness said that he and

---

[2] This opinion will refer to Donald Waterman as "Ducky," as he was referred to during trial and to avoid confusion with his brother, Charles "Chucky" Waterman.

Captain Freddy became acquainted and that, from that point on, Captain Freddy would call on Ducky from time to time when he was in need of transportation. Ducky testified that he also helped Captain Freddy in securing dock space for his sailboat by contacting Mr. Emerson's landlord on Captain Freddy's behalf.

Ducky further testified that Captain Freddy was "hooked on Keno," a lottery game. According to Ducky, Captain Freddy was "lucky[,]" "kept hitting[,]" and "was always winning." Ducky also recounted that Captain Freddy did not keep his good fortune to himself. He testified that Captain Freddy would hand out money to people who were standing outside the convenience stores whenever Captain Freddy would "hit." Ducky recounted that, in late July 2015, Captain Freddy informed him that, in Portsmouth, "he won $800 on one [ticket] and a couple of hundred on another. He hit like three times in one day." Ducky recalled that, around that time, Captain Freddy "hit" at another convenience store in Warwick, and Ducky estimated that Captain Freddy won a couple of thousand dollars on that occasion. Around that time, according to Ducky, Captain Freddy "was hitting three or four times a day."

Ducky proceeded to describe Mr. Gunderway's relationship with Captain Freddy. Ducky recounted how he, from time to time, drove Mr. Gunderway around when Mr. Gunderway needed a ride. On a couple of occasions, Ducky and Mr. Gunderway drove to the convenience store when Captain Freddy was playing Keno. Ducky testified that Mr. Gunderway knew that Captain Freddy had been successful

at playing Keno, and he told Ducky at some point that Captain Freddy "was a lucky guy." Ducky also said that, on another occasion, he tried to assist Captain Freddy find a more powerful engine for his boat through an acquaintance of Mr. Gunderway, and the three men had driven together to look at an engine.

**3**

**Testimony of Troy Gunderway**

Mr. Gunderway's testimony was especially damning to defendant. He testified that he had known defendant for several years, that he had worked with him, and that, at various times, he had lived with him. From the witness stand, he relayed the events surrounding the night of July 31, 2015, and the days that followed.

Mr. Gunderway testified that, on the evening of July 31, 2015, defendant transported him to a meeting with Mr. Gunderway's ex-girlfriend so that he could make a child-support payment. The two men then went to the "Zebra strip joint[.]" The witness said that the pair hung around the strip club for a while, purchased some crack cocaine, and then traveled to the home of defendant's friend. He said that they consumed the crack cocaine en route. Mr. Gunderway testified that he and defendant drank alcohol at the home of defendant's friend until they exhausted their supply of liquor. They then decided to head to Mr. Gunderway's residence to see if there was more alcohol there. Mr. Gunderway recounted that he and defendant encountered Ducky after they arrived at Mr. Gunderway's residence. Mr. Gunderway testified

that Ducky was "bragging" about Captain Freddy's winnings when Ducky jokingly said, "Let's roll him[,]" which Mr. Gunderway understood to mean "rob him." Mr. Gunderway said that he and defendant left shortly thereafter in defendant's truck, "looking for money to go hang out some more[.]" He said that defendant then suggested that they attempt to "borrow" money from Captain Freddy, and with that they drove to Captain Freddy's sailboat.

Mr. Gunderway testified that he boarded the boat, walked down the stairs into the cabin, and called out Captain Freddy's name, but realized that he was sleeping. Mr. Gunderway said that he was sitting at a table in the boat, deciding what to do next, when defendant arrived. According to Mr. Gunderway, he informed defendant that Captain Freddy was sleeping, to which defendant responded, "Well, I have no money. I need money and f**k it. Let's rob this dude."

Mr. Gunderway testified that defendant then proceeded down the stairs and awakened Captain Freddy. He said that Captain Freddy started screaming when defendant, according to Mr. Gunderway, "just went and blasted him like five times in the face * * * [f]ull punches to the face. Blood splurted on the walls, the curtains." Mr. Gunderway admitted to holding Captain Freddy down while defendant threatened Captain Freddy with a knife, stomped on his legs, and demanded money. Eventually, Mr. Gunderway recounted, the two left the boat, leaving Captain Freddy still on the floor and "breathing real heavy[.]"

Mr. Gunderway testified that he and defendant returned to the boat the next morning because Mr. Gunderway had lost his cell phone and thought that he might have left it in the boat. He recalled that, upon arriving at the boat, he called out to Captain Freddy, but there was no response. The witness then said that he went down into the cabin and kicked Captain Freddy's foot. But again, there was no response. Mr. Gunderway testified that he returned to defendant's truck and informed defendant that Captain Freddy was dead. It was at that point, he recounted, that the two agreed that they would cover up the crime scene.

Mr. Gunderway testified that, consistent with Mr. Emerson's testimony, he had returned to the boat on several occasions that day, all in a futile attempt to start the engine. According to Mr. Gunderway, the plan hatched by him and defendant was to dispose of the body before it began to decompose and give off the odor of decaying flesh. Mr. Gunderway recalled that the pair planned to clean the boat, take Captain Freddy's body "out towards the sea[,]" and "throw the body over board and sink it." Mr. Gunderway testified that, to that end, he and defendant purchased cleaning supplies and returned to the boat with a cooler that contained bleach, gloves, a cinderblock, and rope. Mr. Gunderway then recounted his encounter with Mr. Emerson and, consistent with Mr. Emerson's testimony, explained his attempts throughout the day to start the engine.

He testified that eventually, on August 4, 2015, he managed to start the *Star Capella*'s engine. Mr. Gunderway said that he operated the boat out into the bay, when he became aware of the presence of the harbormaster, and so he decided to turn the other way. Mr. Gunderway testified that, after changing course, he motored the boat to "[t]he end of the cove[,]" threw out the anchor, and rowed on the *Star Capella*'s dinghy to shore, where defendant picked him up.[3]

**4**

**Other Evidence Introduced at Trial**

Other evidence admitted during the trial painted a vivid picture not only of defendant's involvement in the killing of Captain Freddy but also of his state of mind between the time of the killing and his eventual arrest.

Video surveillance of the Warwick Cove Marina, along with Google location history, revealed that defendant's truck and cell phone were at the marina from approximately 3:27 a.m. to 4:15 a.m. on August 1, 2015.[4] Other evidence included

---

[3] Mr. Gunderway pled guilty to charges of second-degree murder and conspiracy to commit robbery. He was sentenced to ten years to serve at the ACI for the conspiracy charge and had not yet been sentenced for the murder charge at the time of defendant's trial.

[4] Detective Jean Toussaint, who was assigned to the Warwick Police Department's computer forensics unit, testified that Google location history can provide an individual's location through an electronic device by way of cell tower proximity, WiFi point proximity, and GPS. In this case, the police used Google location history to pinpoint defendant's location through the Google account associated with his cell phone.

Google voice searches made from defendant's cell phone, in defendant's own voice, which were played to the jury and identified by Mr. Gunderway. Those searches involved inquiries that included: "Does bleach kill everything including skin cells?"; "Boat motor mechanic in Warwick, Rhode Island"; "What towns in Rhode Island have garbage days—garbage pickup on Friday morning?"; and "Where would Warwick harbormaster take a towed boat?"

## C

## The Verdict and Sentencing

The defendant was found guilty by a jury on all five counts with which he was charged. He was sentenced to life imprisonment at the ACI for the murder of Captain Freddy; a consecutive ten-year sentence for the conspiracy; and suspended one-year sentences for each of the three misdemeanors, with probation, two being concurrent to the other sentence and one consecutive.

Additional facts are set forth *infra* as necessary to discuss the issues before the Court on appeal.

## II

## Issues on Appeal

Before this Court, defendant offers an array of arguments which, he contends, should cause his convictions to be vacated. First, he asserts that the trial justice erred by failing to suppress the fruits of his third interrogation by the Warwick Police

- 13 -

Department, because the delay between his arrest and presentment to a judicial officer exceeded that which is permissible under Rule 5(a) of the Superior Court Rules of Criminal Procedure and the Fourth Amendment to the United States Constitution. Next, he argues that the trial justice abused his discretion by failing to redact certain recorded prejudicial statements made by defendant while he was in the interrogation room, but outside the presence of his interrogators. Those video recordings were later shown to the jury. Third, he contends that his detention by the Warwick Police Department was extensive, and that he was denied prescription medication during his detention, in violation of his Fifth Amendment rights. Lastly, defendant maintains that the trial justice abused his discretion by failing to suppress a witness's out-of-court identification. We will address each of these arguments in turn.

## III

## Discussion

## A

## The Interrogations[5]

## 1

## Facts

The defendant argues that the trial justice erred by failing to suppress the fruits of his third interrogation by the police because the delay between his arrest and presentment to a judicial officer violated Rule 5(a) of the Superior Court Rules of Criminal Procedure and the Fourth Amendment to the United States Constitution.

The defendant was arrested on misdemeanor charges on August 19, 2015, at about 3 p.m. and he was "booked" at the police station at about 4:26 p.m. His first interrogation began around 5:58 p.m., and the questioning continued for about four hours. Although defendant had been arrested on three misdemeanor offenses, and even though he was examined about the stolen plates in the interrogation room, there is no question that defendant had captured the police's interest with respect to the killing of Captain Freddy and that, according to police, he "became more on [their]

---

[5] The facts set forth in this section have been adduced from the testimony of Detective Mark Canning and Detective Scott Robillard of the Warwick Police Department along with the transcript of defendant's interrogations. The jury and this Court have also viewed the recorded interrogations.

radar" and "a suspect slash witness" when they discovered what appeared to be blood on the knife that had been seized from defendant's person at the time he was arrested. Accordingly, the conversation between the police and defendant soon turned to the circumstances surrounding Captain Freddy's death.

At some point during defendant's first interrogation, Mr. Gunderway had voluntarily reported to the police station and spoke with the police. From time to time, one of defendant's interrogators would leave defendant in the interrogation room and speak with Mr. Gunderway. After speaking to the police for about sixty minutes, Mr. Gunderway completely implicated himself in Captain Freddy's death, relating a story similar to his later testimony, set out *supra*, thereby also implicating defendant. This afforded the police the opportunity to contemporaneously confront defendant with any discrepancies between his and Mr. Gunderway's versions of what had transpired on the *Star Capella* on July 31, 2015, and August 1, 2015. The defendant, after initially denying any involvement with Mr. Gunderway whatsoever, began to shift his story and eventually provided the police with conflicting accounts about what had happened on that night as well as during the days leading up to his arrest. Although defendant never confessed or admitted culpability for Captain Freddy's murder, he did tell police that he was in his parked truck while Mr. Gunderway performed work on the *Star Capella*'s engine on August 1, 2015, and that he later drove Mr. Gunderway to the boat so that he could move it.

The defendant's first interrogation concluded around 10 p.m., and his second interrogation began a few hours later, around 1:20 a.m. on August 20, 2015, the next day. Shortly after his second interrogation began, the police informed defendant that they had spoken with Mr. Gunderway and that, "basically, in a nutshell, you guys were looking for money and you both killed the guy."[6] The defendant, confronted with both the fact of Mr. Gunderway's cooperation and the officers' suggestion that surveillance cameras would reveal if defendant did, in fact, leave his vehicle that night, began to amend his version of events. The defendant conceded, "All right. I went down—listen. I didn't go on the boat. I went down on the dock." He contended that he went on the dock as a lookout for Mr. Gunderway. However, aside from this revelation, defendant continued to deny the officers' factual suggestions for the duration of the interrogation, which lasted for about an hour. The police terminated the interrogation after defendant said that he was tired.

Later that morning, despite the fact that arrangements had been made to bring defendant to the courthouse at 9 a.m. to be arraigned on the three misdemeanor charges, defendant continued to be held at the police station. There, police elected to interrogate defendant for a third time, beginning at 12:25 p.m.

---

[6] Mr. Gunderway had given his statement to the police by approximately 11:30 p.m. on August 19, 2015.

The police asked defendant at the start of the third interrogation, "Anything come to your head last night?" The defendant responded, "Yeah, a lot. * * * About the boat. * * * I remember a lot now, because I did a lot, a lot of f**king thinking." The video recording reveals that defendant then began to relate his version of events, with little interruption by the police. This third time, however, defendant admitted to going onto the boat, but he claimed that it was Mr. Gunderway who sought to, and did, rob Captain Freddy, and that defendant "grabbed" Mr. Gunderway in an effort to stop him, but Mr. Gunderway "kicked [him] in the n**s or almost in the n**s." The defendant continued to "remember" certain factual details that he had not recollected the night before, such as the detail that Mr. Gunderway carried a cooler to the *Star Capella* when they returned to the boat a few hours after their fatal encounter with Captain Freddy. An investigating officer then informed defendant that "[t]he only discrepancy between [his and Mr. Gunderway's] stories at this point, pretty much is who the aggressor was." The defendant then terminated the interrogation, and he was arraigned in the District Court on the three misdemeanor charges later that afternoon.

It is clear from the recorded interrogation that, in each of the three interrogations, defendant spoke to the police of his own volition about the death of Captain Freddy. He waived his *Miranda* rights in writing before each interrogation; and during the first interrogation he provided the police with written consent to

search his cell phone, his truck, and his apartment.[7]  The defendant was given a bathroom break during the first interrogation, a cigarette break after the start of the second interrogation, and prescription medication during the third interrogation; and he was provided with food and water on all three occasions.  The defendant also slept after the second interrogation.  The police described defendant's demeanor as "very cooperative" during the interrogations and said that "[h]e appeared pretty calm, friendly, [and] willing to talk."  Moreover, defendant repeatedly told the police during the interrogations that he wanted to talk with them and that he was "trying to help [them] out."

Before trial, defendant moved in the Superior Court to suppress each of his three interrogations and, consequently, the fruits of those interrogations.  In his motion, he asserted that the Warwick police failed to present him to a judicial officer without unnecessary delay, in violation of Rule 5(a) of the Superior Court Rules of Criminal Procedure.  A hearing on that motion was held on June 12, 2017.  After hearing the testimony of Detective Mark Canning, one of defendant's interrogators, and, importantly, from defendant himself, who testified that he voluntarily spoke to the police during the third interrogation because he desired to tell his side of the story and clear his name, the trial justice denied defendant's motion.

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

In reaching his decision, the trial justice found that there was no "causative effect" resulting from any delay between defendant's arrest and any statement or consent given by defendant. On appeal, defendant contests only the trial justice's conclusions with respect to the third interrogation.

**2**

**Standard of Review**

"This Court's review of a trial justice's ruling with respect to a motion to suppress a statement which a defendant has alleged was made involuntarily requires 'a two-step analysis.'" *State v. Barros*, 24 A.3d 1158, 1179 (R.I. 2011) (quoting *State v. Taoussi*, 973 A.2d 1142, 1146 (R.I. 2009)). "In the first step, we review the trial justice's findings of historical fact relative to the issue of the voluntariness of the confession." *Id.* "We accord deference to the trial justice's findings of historical fact unless those findings are clearly erroneous." *Id.* "If we conclude that the trial justice's findings of historical fact were not clearly erroneous, we proceed to the second step of our analysis. At the second step, we 'apply those historical facts and review *de novo* the trial justice's determination of the voluntariness of the statement.'" *Id.* (quoting *State v. Bido*, 941 A.2d 822, 836 (R.I. 2008)).

# 3

## Analysis

Rule 5(a) of the Superior Court Rules of Criminal Procedure commands, in pertinent part, that "[a]ny person making an arrest without a warrant shall take the arrested person without unnecessary delay before a judicial officer of the District Court[.]"

"In interpreting Rule 5(a), this Court has held that delay in presentment, without more, does not warrant automatic suppression of a statement made during the period of delay. Rather, we have squarely held that 'delay, if it is to render a confession inadmissible, *must have been operative in inducing the confession*.'" *State v. King*, 996 A.2d 613, 622 (R.I. 2010) (emphasis in original) (quoting *State v. Lionberg*, 533 A.2d 1172, 1178 (R.I. 1987)). "We have likewise stated that a 'hearing justice must consider whether the time preceding a suspect's statement had any *causative effect* upon his or her * * * decision to confess.'" *Id.* (emphasis in original) (brackets omitted) (quoting *Lionberg*, 533 A.2d at 1178). "Therefore, 'the elapsed time between the defendant's arrest and his confession is the critical period we must examine and scrutinize in order to determine if it had been *operative in*

*inducing* the defendant's admissions.'" *Id.* (emphasis in original) (quoting *State v. Nardolillo*, 698 A.2d 195, 199 (R.I. 1997)).[8]

Accordingly, "our well-settled case law with respect to Rule 5(a) unambiguously indicates that a defendant who seeks to have an inculpatory statement suppressed because of an unnecessary delay in presentment 'must demonstrate *both*: (1) that the delay in presentment was unnecessary *and* (2) that such delay was causative with respect to' the making of the inculpatory statement." *Barros*, 24 A.3d at 1182 (emphasis in original) (quoting *King*, 996 A.2d at 622).

In this case, where the delay in presenting defendant to a judicial officer is troubling, we will assume without deciding that there was not strict compliance with the requirements of Rule 5(a). We do so because it is our firm opinion that the evidence does not support a conclusion that any delay here was operative in inducing defendant's inculpatory statements.

There can be no question that the third interrogation was fruitful for the police because defendant made more inculpatory statements in that interrogation than he had in the two preceding interrogations. However, we cannot say that any statements made by defendant were *caused* by the delay. The causation element of our Rule 5(a) analysis "militate[s] against the employment of [a] police tactic of delay

---

[8] In this case, although defendant never confessed, he did make statements against his own interest in his changing account of events. We have, therefore, applied the same principles that have been employed in confession cases.

- 22 -

designed to produce an involuntary or unwitting confession[.]" *King*, 996 A.2d at 623 (quoting *Nardolillo*, 698 A.2d at 200). However, those types of tactics are not present in this case. Rather, our review of the record leads us to the unwavering conclusion that the statements that defendant made to the investigating officers in the third interrogation were motivated by defendant's own explicit willingness to cooperate with the officers' investigation and by his desire to distance himself from any responsibility for Captain Freddy's death.

In *King*, this Court held that the inculpatory statements made by the defendant were not caused by any delay in presentment because the defendant was eager to speak with the police and willingly relayed his story "to persuade the police as to the veracity of his version of the events, while simultaneously attempting to shift blame away from himself." *King*, 996 A.2d at 621, 623; *see id.* at 622 (the defendant was on "a mission to tell * * * his side of the story"). In our opinion, that is essentially what happened in this case. Having had the benefit of reviewing the video recording, we come to the inescapable conclusion that defendant's active participation in the third interrogation was an effort to build his own credibility with the police while shifting any criminal liability to Mr. Gunderway.

The third interrogation began with defendant recounting, on his own initiative, a more complete story after indicating that he had done a lot of thinking since the prior interrogation and that he "remember[ed] a lot now[.]" Viewing the three

- 23 -

interrogations together, it is noteworthy that the evolution of defendant's story coincided with his increasing awareness of the knowledge of the officers with respect to the killing of Captain Freddy and defendant's role in that killing. In the recordings, as the state argues, defendant appears "calm, friendly, [and] willing to talk." Indeed, by defendant's own admission in the course of his testimony at the hearing on his motion to suppress, he had spoken with the police during the third interrogation in an effort to tell his side of the story and, thus, clear his name. Therefore, it is our firm opinion that there was no causative effect between any delay in defendant's presentment and the statements that he made during the third interrogation.

The defendant places great emphasis on the federal counterpart to Rule 5(a) and points us to analogous caselaw interpreting Rule 5(a) of the Federal Rules of Criminal Procedure.[9] Nonetheless, as we have said in prior opinions, Rule 5(a) is "'not a constitutional command to be found within the text of our Federal or State Constitutions, and its breach does not necessarily create any constitutional violation.' [Rather], this Court has viewed 'the rule as a prophylactic measure designed to prevent other constitutional infirmities.'" *King*, 996 A.2d at 621 (quoting

---

[9] Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure provides, in relevant part, that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer[.]"

*Nardolillo*, 698 A.2d at 199). "While cases interpreting and applying federal rules may at times be enlightening as we interpret and apply our rules of criminal procedure, those federal cases are by no means binding on us as we deal with a Rhode Island rule such as Rule 5(a)." *Id.* at 621 n.17. Accordingly, and in view of the fact that we have available our own well-defined jurisprudence, "we consider defendant's reliance on such federal cases as *Corley v. United States*, [556] U.S. [303], 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009), to be largely misplaced." *Id.*

Accordingly, we hold that the trial justice did not err in denying defendant's motion to suppress the fruits of his third interrogation.

## B

## Inculpatory Statements Captured by Interrogation Room Recording

The defendant next argues that the trial justice erred by declining to redact certain prejudicial statements he made while he was alone in the interrogation room.

## 1

## Facts

Although defendant implicated himself in the death of Captain Freddy only minimally during the first interrogation, he did make some statements that raised eyebrows. The defendant maintained throughout the first interrogation that he believed that the *Star Capella* was owned by Ducky, and he said that Mr. Gunderway had to move the boat for Ducky because the dock rental was expiring. At one point,

the detectives asked defendant if Mr. Gunderway had contacted him between the time the boat had been moved and the time of defendant's arrest. Specifically, the police asked defendant if Mr. Gunderway mentioned anything about a T-shirt that was found wrapped around Captain Freddy's feet and ankles when the decedent's body was discovered.[10] The defendant responded, "I think he said like Ducky's boat stinks or something. Ducky needs to clean his boat, it f**king stinks. And I think I said, well why not just f**king burn it then. You know? If it stinks that bad, which I was joking with him." The interrogation ended shortly thereafter and the police left the room. Speaking to himself in an empty room, defendant exclaimed, in a Hamlet-like soliloquy, "I'm f**ked. Oh, no. I'm f**ked man. * * * F**ked up— going to jail for the rest of my life, bro. * * * They're gonna f**king put me and I'm never leaving f**king jail again."

At trial, defendant was heard on his motion to redact that statement before the video recordings of his interrogations were played to the jury.[11] The defendant argued that the statement should be excluded under Rule 403 of the Rhode Island Rules of Evidence because the statement would cause speculation among the jury

---

[10] Earlier in the first interrogation and after being pressed about his involvement in the death of Captain Freddy, defendant told the police that "Troy did something to him." When pressed further, defendant said, "He said he choked him * * * there was a f**king shirt or a white [T]-shirt or something. * * * It's Troy's."

[11] The defendant also moved to redact two other statements made under similar circumstances. However, on appeal, defendant contests only the trial justice's ruling with respect to the above-recited statement.

about whether it was an admission of guilt. The trial justice denied the motion, finding that the statements were "relevant and probative and not so prejudicial" as to outweigh their probative value.

**2**

**Standard of Review**

"In reviewing the admission or exclusion of evidence, it is well settled that the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of discretion is apparent." *State v. Cavanaugh*, 158 A.3d 268, 273 (R.I. 2017) (brackets omitted) (quoting *State v. Peltier*, 116 A.3d 150, 153 (R.I. 2015)). "[O]nly rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a trial court's on-the-spot judgment concerning the * * * weighing of probative value and unfair effect." *State v. Patel*, 949 A.2d 401, 413 (R.I. 2008) (brackets omitted) (quoting *United States v. Rodriguez-Estrada*, 877 F.2d 153, 155-56 (1st Cir. 1989)).

**3**

**Analysis**

Rule 403 of the Rhode Island Rules of Evidence provides, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or

by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Our precedent makes plain, however, that "[i]t is only evidence that is marginally relevant and enormously prejudicial that must be excluded." *Patel*, 949 A.2d at 412-13. It is apparent, then, that a defendant seeking to overturn a trial justice's admission of evidence under a Rule 403 analysis has a high hurdle to clear.

After reviewing the record, we discern no error on the part of the trial justice. There can be no question that defendant's statement, "I'm f\*\*ked. \* \* \* [G]oing to jail for the rest of my life," is probative of defendant's awareness of the compromised position in which he found himself. When the first interrogation is considered as a whole, the contested statement was made after he had agreed to allow the police to search his phone, truck, and apartment, after he knew that Mr. Gunderway had been speaking with the police, and after defendant had shared somewhat incredible details of his involvement, such as when he suggested burning the boat to Mr. Gunderway after Mr. Gunderway told defendant that there was a foul odor emanating from the boat. Under these circumstances, we reach the same conclusion as did the trial justice and hold that the probative value of these statements is not outweighed by their prejudicial effect. *See Patel*, 949 A.2d at 414 ("Under our law, we do not distinguish between the probative value of circumstantial and direct evidence; the

jury must weigh the evidence and determine whether it establishes the guilt of the accused beyond a reasonable doubt.").[12]

## C

## Other Issues

The defendant raises two additional arguments before this Court on appeal: (1) his detention by the Warwick Police Department was extensive and he was denied medication during the detention in violation of his Fifth Amendment rights and (2) the trial justice abused his discretion by failing to suppress a witness's out-of-court identification. It is apparent from the record, however, that neither of those issues was raised prior to or during the defendant's trial. Pursuant to our well-settled raise-or-waive rule, "no party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict[.]" *State v. Hunt*, 137 A.3d 689, 693 (R.I. 2016) (brackets omitted) (quoting Super. R. Crim. P. 30). As such, we need not, and shall not, address these issues on appeal.

---

[12] We note that, even if this evidence had been admitted in error, the evidence would be subject to a harmless-error analysis. Given the overwhelming evidence introduced against defendant at trial that was probative of his guilt, we would affirm defendant's conviction even if the trial justice had erred in admitting the statement. *See State v. Doyle*, 235 A.3d 482, 497 (R.I. 2020) ("[B]ased on the extensive record in this case and the overwhelming evidence presented at trial, we are of the opinion that, even if there were evidentiary error, it was harmless beyond a reasonable doubt.").

# IV

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.[13]

Justice Flaherty participated in the decision and authored this opinion prior to his retirement.

Justice Lynch Prata and Justice Long did not participate.

---

[13] We pause to note that the recording of all custodial interrogations in this case enabled the finder of fact and this Court to see and hear the defendant's statements first hand, rather than in the form of a second-hand rendition from the witness stand. This advances the interests of justice, and we urge all law-enforcement agencies to do the same.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Richard Baribault. |
| **Case Number** | No. 2019-59-C.A.<br>(K1/16-69B) |
| **Date Opinion Filed** | March 31, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General<br>For Defendant:<br><br>J. Richard Ratcliffe, Esq. |

SU-CMS-02A (revised June 2020)